TURNER *v.* STATE.

(*Nashville*, December Term, 1948.)

Opinion filed March 11, 1949.

CARMACK COCHRAN and HARDIN H. CONN, both of Nashville, for plaintiff in error.

NAT TIPTON, Asst. Atty. Gen., for defendant in error.

MR. JUSTICE GAILOR delivered the opinion of the Court.

Defendant appeals from conviction of voluntary manslaughter for the killing of W. A. Jernigan in Davidson County on April 22, 1946. Punishment was fixed by the verdict at not more than five years in the penitentiary.

The series of events which led to the killing are not in controversy, nor is the age and occupation of the defendant. He was 78 years old in 1946, and had been for many years in the dairy and cattle business. He is a tall man, six feet, three inches, and weighs about 165 to 170 pounds. He is active for his age and his vision is little impaired. For 50 years he has worn a pistol as a part of his clothing, carrying it unlawfully but habitually.

The deceased, W. A. Jernigan, was much younger, about 39 years old and smaller than defendant, weighing only about 135 pounds. Jernigan was employed as superintendent of Lealand Estates, a 1200 acre tract of subdivided land south of Nashville. Jernigan, with his family, lived on the tract near the intersection of Lealand Lane, which runs generally north and south, and Tyne Road, which runs generally east and west. The killing occurred at the intersection of these two roads.

On the Thursday before the killing, Jernigan found a herd of about 28 beef cattle running at large on Lealand Estates, and on the order of his employers, he impounded them in a corral some 150 yards from the house where he lived, and the gate of this corral opens on the crossroad where the killing occurred and where the action centered in this record. Shortly before noon on Saturday, April 20, Turner while passing this corral on another mission, saw the cattle and identified them as his cattle. He went to Jernigan and talked about the release of the cattle, and was told that this could be done only by the order of Jernigan's superior, Mr. McNeill. Late in the afternoon of the same day Turner returned and talked to McNeill and Jernigan about the return of the cattle. According to McNeill's testimony, to which no objection was made, immediately on seeing Turner approach, Jernigan urged McNeill to avoid argument with Turner because Turner was known to be a dangerous man. Gambill testified that the defendant was known to him to be "high tempered." The jury had this evidence before it when weighing the credit to be given the contradictory statements of Jernigan's assault on Turner.

Turner was told by McNeill that the release of the cattle could only be effected by consent of the Estates' lawyer, Mr. Evans, and that Mr. Evans would not be back in his office until early Monday morning, but Turner was allowed to return and feed the cattle on Sunday. During Monday morning, negotiations were entered into and a settlement effected for the damage which the cattle had done to shrubs and lawns. Turner was told that he could get the cattle at 4:00 o'clock in the afternoon and accordingly, at or about that hour he took two trucks, a

passenger car, and five men to the gate of the corral for the purpose of removing the cattle. During the negotiations Saturday and Sunday and until 4:00 o'clock Monday, the relations of all parties were entirely peaceful and friendly.

Turner went to the house where Jernigan lived and was told that he would have to wait until the key to the gate of the corral was secured from Jernigan who was working about one-half or three-quarters of a mile away, cutting shrubbery.

From this point on, the action and events are in hopeless controversy and contradiction. There were some ten eyewitnesses of the killing or parts of it. The witnesses reasonably and naturally divide themselves into two camps. The employees of Lealand Estates testified favorably for the State, and the defendant and his employees testified favorably for him. Conflicts in the evidence have been resolved against the contentions of the defendant by the jury's verdict, and as each group of witnesses is equally credible, there is no preponderance in favor of the innocence of the defendant. On the contrary, we find the State's case supported in many particulars by the undisputed physical facts and the usual natural laws of human behavior.

◼ In brief, the State's case is this. Jernigan, driving his car with State's witness Gambill as a passenger, came down from the south on Lealand Lane, turned right and stopped his car on Tyne Road. Jernigan's car was followed at an interval of about 30 yards by another car driven by a workman named Swoner. In this car were the following State's witnesses; Jesse Swoner, Charlie Swoner, Ed Stanley and Louis Stanley. Swoner's car stopped in Lealand Lane just before the intersection with

Tyne Road, but about 25 feet from the gate where the shooting occurred. Between the Swoner car and the spot where Turner stood when he fired, there was a bank of earth along the eastern edge of Lealand Lane and between its edge and the gate of the corral. There is much controversy about whether or not this bank prevented the occupants of the Swoner car from seeing what occurred. The witnesses were energetically cross-examined on this by the defense, and photographs showing the height of the bank were before the jury. This is no more than a question of the credibility of the witnesses and is foreclosed by the verdict. *Christian* v. *State*, 184 Tenn. 163, 197 S. W. (2d) 797; *Ferguson* v. *State*, 138 Tenn. 106, 196 S. W. 140.

According to the State, when Jernigan stopped his car members of the Turner party were taking the gate off the hinges for the purpose of releasing the cattle and loading them on the trucks. Jernigan asked Turner and his party to leave the gate undisturbed until he (Jernigan) had an opportunity to go to his house, which was nearby, and secure the key to the corral gate.

All seven State's witnesses say that Jernigan halted his car momentarily at the intersection of Tyne Road and looked to his right and left for traffic, and then pulled on into Tyne Road and got out of his car; that there was then some conversation with Turner and his party about the gate; that Turner threatened to take the gate off the hinges if Jernigan did not hurry for the key. This interchange between Turner and the deceased was accompanied by some profanity and some angry words. The State's witness, Gambill, admits that the conversation frightened him. When asked why he was frightened he said that it was because he knew Turner's reputation,

and that he was a high-tempered man. While this conversation was taking place, all the evidence is that the two men were standing from 18 to 20 feet apart. From the State's point of view, the best account of the details of the shooting is that of Gambill, who is apparently the State's most intelligent witness. He said that after Jernigan had asked Turner and his party not to take the gate off the hinges, but to wait and let him get the key, that Turner said, "You had better hurry. If you don't I will take it off." That immediately after this Jernigan bent over as if to pick up something from the ground, and that as he was straightening up Turner drew his pistol and shot him once; that Jernigan staggered toward Turner and Turner fired two more shots in rapid succession; that Jernigan went down; that Turner sprang upon him, straddled his body and was choking him; that Jernigan said, "Don't let him kill me." That the witness (Gambill) pulled Turner off Jernigan's body and took his pistol. That Jernigan had nothing in his hand, and that when he stooped to pick something up he was not successful because there was nothing on the ground in that part of the scene for him to pick up. Both witnesses for the State and some of those for the defendant say that there was an interval between the first and the second and third shots, that is, that there was an interval between the first and second shot, and that the second and third shots were fired in rapid succession.

One shot, possibly the first, entered the crest of Jernigan's right shoulder and ranged diagonally across his body, lodging on the left side near the navel. Another shot was in his right arm, which caused considerable bleeding. The third shot, according to Gambill, "glazed" Jernigan's hair. There was evidence that after the en-

counter, Turner's head was bloody. From the evidence of Gambill and other State's witnesses, the jury was warranted in concluding that the blood was Jernigan's from the wound in his right arm.

Turner and the majority of his witnesses give a different account of the occurrence which is in hopeless conflict and irreconcilable with the testimony of the State. They say that Jernigan drove his car down Lealand Lane at a high rate of speed and came to a sudden and violent stop, raising a cloud of dust. That he first got out of his car while it was parked in Lealand Lane, that some 10 minutes before Jernigan's arrival on the scene,. the gate had been taken off the hinges, and at the order of Mrs. Jernigan and a man named Mullins, who shouted from a neighboring barn, the gate had been replaced before Jernigan arrived. That when Jernigan got out of his car when it was parked in Lealand Lane, he approached the Turner party and said ''You didn't find it so God damn easy to break the gate down.'' That after some further angry words Jernigan got back in his car and drove it around into Tyne Road and stopped, got out and came back; and after some further profane warning to leave the gate alone until he (Jernigan) got the key, he went back around the front of his car as if he was going to get in the driver's seat, but turned and came back around the front of the car toward Turner, stooped and picked up a rock, and while advancing on Turner, raised his arm as if to throw the rock. That Turner drew his pistol and fired once; that after an interval, while Jernigan continued to advance, Turner fired the second and third times. That Jernigan struck Turner in the head and the two men clinched and fell on the ground. According to the defense witness, Burkett, who was standing at the

gate post and nearer to Jernigan when he stooped, even than Turner, if Jernigan had anything in his hand Burkett did not see it.

From our statement, it will be seen that all such questions as whether the occupants of the Swoner car could, from where they parked it, see what occurred; the movement of Jernigan and his automobile, whether it stopped first in Lealand Lane and was later moved to Tyne Road, and whether Jernigan got out of his car one or more times, whether he picked up a rock or whether he unsuccessfully tried to do so, were all jury questions and determined by the jury's verdict.

". . . the jury are the exclusive judges of the credit of the witnesses, and in all cases much must occur before the court and jury, properly calculated to act upon their minds, which cannot be transferred to paper. A verdict therefore, in all cases, must have great weight with this court." *Kirby* v. *State*, 22 Tenn. 289, 304.

". . . we (the Supreme Court) will go into no detailed statement or argument as to the credibility of witnesses, or slight discrepancies and conflicts in testimony; all these questions having been settled by the verdict of the jury. It must appear to all that, under the rules we have stated, no case can be reversed on the facts where an elaborate argument of the evidence is necessary to effect that end. The very necessity for such a thing rebuts the idea that the verdict is against the clear preponderance of the evidence; nor, as a rule, is it properly the province of the court to make an argument, but, on the contrary, . . . to state its conclusion, upon both the facts and the law." *Cooper* v. *State*, 123 Tenn. 37, 60-61, 138 S. W. 826, 831.

"We have said in numerous cases that the verdict of the jury determines the credibility of witnesses. This is necessarily so. We do not see the witnesses nor hear them testify, and mere discrepancies in their testimony must be deemed settled by the verdict of the jury unless there is something to show that such discrepancies originated in willful falsehood." *Ferguson* v. *State*, 138 Tenn. 106, 109, 196 S. W. 140, 141.

To support this appeal the defendant makes 57 assignments of error. We will not consider them separately because in making them the defendant ignores at least three well-settled rules of this Court. (1) Even on a criminal appeal there is no hearing *de novo*. *Kirby* v. *State, supra*; *Cooper* v. *State, supra*; *Foster* v. *State*, 180 Tenn. 164, 172, 172 S. W. (2d) 1003. (2) That this Court will not consider any assignment on the admission or exclusion of evidence unless timely objection and exception was made in the Trial Court and the Trial Judge so given an opportunity to make correction. Rule 14, subsection (4), 185 Tenn. 868. (3) No assignment of error on the Judge's charge to the jury, either for omission or inadequacy, will be considered unless a special request was tendered, pointing out the defendant's contention as to the error. Code, sec. 11750; *State* v. *Becton*, 66 Tenn. 138; *Powers* v. *State*, 117 Tenn. 363, 370, 97 S. W. 815.

The inquiry in this Court is not whether the defendant is guilty beyond a reasonable doubt, but whether on the record made in the Trial Court, the defendant proved his innocence by a preponderance of the evidence. *Mahon* v. *State*, 127 Tenn. 535, 156 S. W. 458; *Colbaugh* v. *State*, 188 Tenn. 103, 216 S. W. (2d) 741, opinion January 17, 1949.

Since after his conviction, the defendant is here under a presumption of guilt, and by their verdict the jury have conclusively determined that the State's witnesses are to be believed rather than those for the defendant, it appears that when Jernigan came onto the scene of the tragedy, Turner and his party were in the act of committing a trespass by forcing the gate. Being thus in the course of the commission of an unlawful act at the time, the burden of proving self-defense is aggravated for the defendant.

Furthermore, there was strong evidence that there was an appreciable interval of time between the firing of the first and second shots, so that the jury was justified in considering whether the second and third shots were fired in self-defense, even if the first shot was.

The State's theory was supported by the testimony of seven eyewitnesses, and in crediting their testimony, the jury correctly found their account supported by the natural laws of human emotion and behavior. We find no preponderance of the evidence in favor of defendant's innocence, nor do we find his plea of self-defense supported by the weight of the evidence. The assignments of error on these points are overruled.

Assignments two through ten which have to do with alleged errors in the Trial Judge's charge to the jury, are overruled on the authority of *Gentry* v. *State*, 184 Tenn. 299, 198 S. W. (2d) 643, and authorities cited, *supra,* because no special request covering these alleged defects in the charge were tendered to or acted upon by the Trial Judge.

Assignments of error 11 through 21, based on improper argument by the Attorney General and Special Prosecutor, are overruled because no timely objection

was made to permit correction by the Trial Judge, and because such objections as were made to the argument were ruled on favorably to the defendant by the Trial Judge.

"It is thoroughly settled, under our practice, that objectionable argument or improper remarks of counsel afford no ground for a new trial, where no objection is made or exception taken at the time of the argument. *Smith* v. *State*, 90 Tenn. 575, 18 S. W. 248; *King* v. *State*, 91 Tenn. 617, 20 S. W. 169; *Morgan* v. *Duffey*, 94 Tenn. 686, 30 S. W. 735; *Ferguson* v. *Moore*, 98 Tenn. 342, 39 S. W. 341." *Sherman* v. *State*, 125 Tenn. 19, 47, 140 S. W. 209, 216. Compare Supreme Court Rule 14, subsection 4, 185 Tenn. 868.

Assignments 22, 23, and 24 are overruled because when the objectionable question was asked on cross-examination, and before the defendant had answered, the defendant's counsel objected and the Trial Judge sustained the objection. Certainly a defendant cannot predicate error on a ruling of the Trial Judge favorable to himself, for reasons of common sense too basic to require citation of authority.

Assignment 24 is overruled because on objection, the question was withdrawn and never answered by the witness.

Assignment 25 is based on a question asked defendant about the money he had been required to pay to release his cattle, and specifically whether he "liked" having to make the settlement. After objection, the Trial Judge, himself, rephrased the question and the defendant answered by saying he did not know that he disliked it. There was no objection at the time of this question and answer, and no exception taken for our review. Rule

14, *supra*; *Railroad* v. *Reagan*, 96 Tenn. 128, 33 S. W. 1050.

█ Assignments 26 through 37 are based on alleged misconduct of the prosecution in the examination of witnesses. They are overruled on authority of Code, sec. 10654, because points in the trial upon which they were based were not of sufficient importance to affect the result or justify a reversal.

█ █ Assignments 38, 39, 40, 41, 42, and 43, based on the limitation of the cross-examination of State's witnesses by the Trial Judge and his action in directing the examination of witnesses in certain particulars, are overruled since such limit rests in the sound discretion of the Trial Judge, and we find no abuse of such discretion. *Carrol* v. *State*, 79 Tenn. 480.

█ Assignments 44 and 45 are based on the action of the Trial Judge in refusing to permit introduction by the defendant of an affidavit made by a defense witness, Rittenberry, prior to the trial. On cross-examination, the defense witness testified that he didn't know certain things and was reluctant to testify. The action of the Trial Judge in refusing to permit the introduction of the affidavit was clearly correct. Impeachment of his own witness by the defendant is permissible under certain conditions, but these conditions were not present here, and it is never competent to permit the jury to weigh oral testimony on the stand against pre-trial statements and make a selection of that which is credible. *King* v. *State*, 187 Tenn. 431, 215 S. W. (2d) 813, 814; Wharton's Criminal Evidence, 10th Ed., sec. 484a, p. 1002.

█ █ Assignments 46 through 52, based on the admission of State's evidence in rebuttal, are overruled. The admission or rejection of rebuttal testimony and

the control of the order of proof, are matters necessarily in the discretion of the Trial Judge. We find no abuse of the discretion he exercised here in permitting the State to clarify the record as to whether Jernigan was left-handed or righthanded. *Martin* v. *State*, 157 Tenn. 383, 386, 8 S. W. (2d) 479, and numerous cases there cited and considered.

Assignments 53 through 56 are based on the admission of alleged incompetent evidence to which no objection was made or exceptions preserved. Of it, one of the lawyers said at the time, ''We have been neglectful of objecting to it.'' No ruling on the evidence assailed was secured from the Trial Judge. The question of the competency of the evidence is not before us for review. Rule 14, subsection (4), *supra*.

 The final assignment is a general summation of the alleged errors which we have considered, and insists that on account of those errors defendant was denied a fair trial. On the contrary, our study of the record convinces us that he was ably and agressively represented by competent counsel who took full advantage of every opportunity to effect his defense.

We are impressed also with the care and patience of the experienced Trial Judge who charted the course and kept the trial within bounds despite the heat of advocacy both for the State and for the defense.

The verdict of the jury shows that they gave the defendant the benefit of all extenuating circumstances, including those incidental to his age and position. This Court has given the case extraordinary consideration. We made an exception to the rule limiting argument and gave an entire day to the hearing of this case. We have since carefully studied the long record and the voluminous

brief filed by the defendant. Our conclusion is that there was no reversible error, and that the judgment modified to provide that defendant shall serve not less than two nor more than five years in the penitentiary, Code sec. 10775, must be affirmed.

All concur.