GANG *v.* STATE.

(*Knoxville,* September Term, 1950.)

Opinion filed December 9, 1950.

Morgan & Coleman, Fletcher Morgan, W. N. Dietzen and Thomas O. Jewell, all of Chattanooga, for plaintiff in error.

Nat Tipton, Asst. Atty. Gen., for the State.

Mr. Justice Burnett delivered the opinion of the Court.

The plaintiff in error was convicted of voluntary manslaughter, with the maximum punishment fixed by the jury at five years confinement in the State prison, from which judgment he appeals.

The assignments of error present two propositions; first, that the evidence preponderates against the verdict and in favor of the accused that he committed the homicide in his own necessary self-defense.

██ ██ Under this assignment the plaintiff in error takes upon himself the burden of showing us that the evidence preponderates against his guilt and that the homicide was committed in his own necessary self-defense. As has often been said by this Court, under similar assignments, the plaintiff in error comes here under a presumption of guilt. We have often said that where a fact question was squarely presented to the jury, pro and con, then their verdict is final as to the credibility of the several. witnesses. *Christian* v. *State,* 184 Tenn. 163, 164, 197 S. W. (2d) 797; *Turner* v. *State,* 188 Tenn. 312, 219 S. W. (2d) 188. It seems to us that there is no escape from the legal conclusion of these cases on this question. Common sense demands such a holding. Such a holding is eminently fair and gives the accused the benefit of all doubt. Obviously the jury and the trial judge who see and hear these witnesses face to face are in a far better position to determine who is correctly detailing the truth of the situation than are we who see only the transcript record of their evidence.

What are the facts? The homicide occurred about 8:00 o'clock on the evening of April 16, 1949, at the place of business operated by the plaintiff in error in Chattanooga. The place of business of the plaintiff in error was a beer parlor and lunch room. The plaintiff

in error had formerly been connected with the police force of Chattanooga as a policeman and detective but a few years prior to the commission of the crime for which he is charged herein he had been retired on account of physical disability.

On the evening of the homicide the deceased, Lawrence Maine, and others were in the place of business of the plaintiff in error, drinking beer and soft drinks, eating sandwiches, playing the pinball machine, etc. The record shows that the deceased wished to match dollars with another occupant of the place and he was admonished by the wife of the plaintiff in error not to do this. When she told him not to match dollars there he proceeded to argue with her about this and in the course of the argument she took a partly empty beer bottle away from him and put it up on the shelf. The deceased was apparently much given to bombast. His nickname seems to have been ''Windy'' and from what all of the witnesses say about him he was a rather windy or bombastic individual. The deceased was a small man, weighing about 133 pounds, while the plaintiff in error was a large man weighing something over 200 pounds. Just shortly before the homicide while this argument was going on between the deceased and the wife of the plaintiff in error, the plaintiff in error who was back in the kitchen of the establishment heard the argument and came out and inquired what was the matter. When he had been told as to what the argument was he informed the deceased that he could not match money there and gave a reason therefor. About this time the deceased said to the plaintiff in error that he had been running this place up to now but that he, the deceased, was now taking over. About the time this remark was made the plaintiff in error got his

pistol from a shelf near where they were standing and shot the deceased in the chest. Witnesses who were apparently disinterested say that the deceased then said "Red, you shot me, why did you do it?" These same witnesses also say that the wife of the plaintiff in error was not present at the place of the shooting but was back in the kitchen. After the shot was fired she came out and said: "Damon, why did you do that?" To which the plaintiff in error replied in substance that he did not give a damn.

Immediately after the shot was fired and the remarks last above quoted were made the deceased turned to walk out the door and just as he got outside he fell to the sidewalk or porch where he died within a very few minutes thereafter.

The theory of the plaintiff in error is that he shot in his own necessary self-defense. His testimony, supported by his wife, is that after he came out and talked to the deceased about matching coins, the deceased told him that he had run his place up to the present time, but that he, the deceased was now taking over, and that he, the plaintiff in error, had better get his pistol. He testifies that when the deceased made this statement he, the deceased, rose up off his stool upon which he was sitting with a bottle of beer in his hand, and thereupon the plaintiff in error says he procured his pistol. The plaintiff in error says that at this time the deceased slid off his stool upon which he was sitting, drew the bottle back and started to throw it, and that simultaneously with the departure of the bottle from the hand of the deceased, he fired. Two or three investigating officers and other witnesses testify that the wife told them that night, immediately after the shooting, and the next morning that

she was not present when the shot was fired and did not know anything about it other than the discussion about matching coins. The wife denies making these statements to these impartial witnesses and corroborates in every detail the statements as made by her husband as to how the homicide occurred.

Clearly under a situation of this kind where only the credibility of the various witnesses is involved a jury question alone is presented. We have very carefully read this evidence and our feeling is that the evidence greatly preponderates in favor of the verdict of the jury rather than against it. We can see no excuse at all for the plaintiff in error shooting the deceased under the circumstances as presented by this record. In the first place the deceased was a much smaller man, he had no weapon that could seriously injure the plaintiff in error even if he had been attempting to use it, and second, the plaintiff in error being a much larger man, even though he did have a physical disability, that of heart trouble, certainly he could have avoided shooting the deceased under the circumstances presented. We must therefore overrule this insistence of the plaintiff in error.

The second insistence made by the plaintiff in error has given us considerable concern. This insistence is that the trial judge erroneously struck from the files a motion on the part of the plaintiff in error to try him for no higher crime than that of involuntary manslaughter.

The transcript shows that upon a former trial of this case the jury were unable to agree and that by consent a mistrial was ordered.

The plaintiff in error upon the second trial filed a plea denominated by him as a plea of "Plea of Res Adjudicata." This is really a plea of Autrefois Acquit, al-

leging in substance, that the plaintiff in error was there-tofore put to trial on this same indictment and that after the evidence had been completed, the jury charged and they had retired, they returned to the jury room and were asked by the trial judge how they stood numerically when the foreman of the jury responded: "All of the jury has agreed on a verdict of involuntary manslaughter but we are unable to agree upon the punishment to be inflicted."

After this statement was made by the foreman the trial judge told them that he did not ask them for that and merely asked them how they stood numerically. Then after he was told how they stood numerically he ordered them to go back and consider further of their verdict. It then appears that the jury later came in and stated that they could not agree and they were discharged and a mistrial was entered.

■ Under these circumstances the plaintiff in error takes the position that in view of the statements above quoted made by the foreman of the jury in the first trial that he could not again be put to trial for any higher degree than that of involuntary manslaughter. Upon the trial of the present case the district attorney general moved to strike this plea. Of course under such a motion the plea must be taken as true for the purpose for which it is filed just as if it had been demurred to.

■■ When we so consider this motion, what is its effect? Under the Indeterminate Sentence Statute of this State it is the duty of the jury to fix the maximum sentence of convicted felons. Code, Section 11766. When the jury has not thus completed its function, that is, to fix the maximum period of confinement, then the verdict of the jury is a nullity and of no effect. *Oliver* v. *State,*

169 Tenn. 320, 87 S. W. (2d) 566. The trial judge did not have the right to exercise this function of the jury. His only right was to fix the minimum sentence as prescribed by statute, the jury fixing the maximum sentence. Code, Section 11766.

It would thus appear that since the jury had not completed its function, that is, of fixing the maximum penalty of the plaintiff in error that they had not agreed upon a verdict. In the case of *People* v. *Hicks,* 287 N. Y. 165, 38 N. E. (2d) 482, 485, 138 A. L. R. 1222, that court held among other things that ''Until the jury has reached agreement upon every part of the verdict it has not agreed upon the verdict'', and ''Until the twelve judges have agreed on every part of the verdict, they have not agreed on any verdict.'' In 23 C. J. S., Criminal Law, Section 1408, p. 1103 it is said: ''Where the jury fail to assess the punishment pursuant to statutory mandate, the verdict will not sustain a judgment, and the court should decline to receive the verdict.''

██ ██ Therefore since no verdict was reached and a mistrial ordered by agreement of the plaintiff in error, he is not entitled to his discharge as having been once in jeopardy. ''It is now generally held that the discharge of the jury, where after full consideration they failed to agree, and there is no reasonable expectation that they will be able to agree, is not a bar to another trial, on the ground that such a condition of affairs constitutes absolute and urgent necessity and justifies the court in discharging the jury.'' 22 C. J. S., Criminal Law, Section 260, p. 398. One of the many cases cited as authority for this statement is our case of *Usary* v. *State,* 172 Tenn. 305, 112 S. W. (2d) 7, 114 A. L. R. 1401. In this case Usary was indicted on a two count indictment, the jury

acquitting him on one count but failing to agree on the second count and a mistrial was declared. When the case came up for trial on this second count, the second time, a plea of former jeopardy was filed but it was held by this Court that the plea must fail. The reasoning of this Court in that case, in many respects, is applicable to the facts of the instant case.

The Supreme Court of Alabama in *Washington* v. *State,* 125 Ala. 40, 28 So. 78, had under consideration a similar situation to that presented by the instant case. The Alabama court in the case referred to held that the accused was not entitled to his discharge for having been once put in jeopardy.

There is no suggestion in this record that the jury upon the former trial undertook to return any verdict, partial or otherwise, to the court then trying this case. All they did was to inform the trial court that they were divided upon the punishment to be inflicted, although they were in accord upon the degree of guilt. Their response to this effect was not what the trial court had asked them. There was no suggestion that they undertook to return either a special verdict or a general verdict.

In conformity with what we have just said, this Court in *Clark* v. *State,* 170 Tenn. 494, 97 S. W. (2d) 644, 647, used some expressions that are very pertinent in the instant case:

"But note the words italicized by us. In the instant case, however fully it may be made to appear that the jury arrived among themselves at the decision that petitioner was not guilty, there is no claim that they agreed to so report or return, or that they agreed to report any agreement whatever, except that they could not agree." And further:

"We have here no 'verdict' reported, and none 'agreed on and intended to be expressed.' It is conceded here that the report of disagreement was that intended to be reported. This determinative distinction runs through all the cases we have examined."

Our conclusion therefore necessarily is that no valid agreement was reached upon the first trial authorizing the holding that the plaintiff in error had been delivered from jeopardy in all degrees of the homicide save of involuntary manslaughter.

The judgment below must be corrected to comply with the Indeterminate Sentence Law in that the judgment should read that the plaintiff in error will be confined in the penitentiary for a period of not less than 2 nor more than 5 years, the maximum fixed by the jury. As thus corrected the judgment below will be affirmed with costs.

All concur.