CLARENCE WADE ANDERSON, ROBERT FRED ASHE
and JACK A. KALINKA,

*v.*

STATE OF TENNESSEE.

(*Nashville,* December Term, 1959.)

Opinion filed October 7, 1960.

Cordell H. Sloan, Memphis, for Clarence Wade Anderson.

Hooker, & Hooker, Nashville, for Robert Fred Ashe.

No appearance for Jack A. Kalinka.

THOMAS E. FOX, Assistant Attorney General, for the State.

MR. JUSTICE FELTS delivered the opinion of the Court.

Plaintiffs in error, Clarence Wade Anderson, Robert Fred Ashe and Jack A. Kalinka, hereinafter called defendants, were jointly indicted for larceny of diamond rings of the value of $8,214.17, the property of Graves-Steuwer, a jewelry store in Memphis, Tennessee, with an additional count charging Kalinka with being an habitual criminal (T.C.A. sec. 40-2801 et seq.).

Upon the trial the jury found defendants guilty of the larceny as charged, and fixed the punishment for Anderson and Ashe at not more than 5 years, and for Kalinka at not more than 10 years, in the State Penitentiary. The jury found Kalinka not guilty on the count charging him with being an habitual criminal.

The Trial Judge overruled defendants' motions for a new trial, approved the jury's verdicts, and entered judgments thereon. Defendants have brought up the case by appeals in the nature of a writ of error. No error has been assigned for Kalinka. Anderson and Ashe have separately assigned errors, challenging the sufficiency of the evidence to sustain the convictions, and seeking a reversal upon a number of other grounds.

Evidence for the State was that Graves-Steuwer, a corporation, operated a jewelry store on Poplar Plaza in the City of Memphis, Tennessee. The main or sales floor was on the level with the street, and there were downstairs rooms where the concern had its office, and where packages were gift-wrapped and diamonds were kept while not on display for sale. On the main floor were counters or cases displaying diamonds, watches and other jewelry.

A number of photographs of these counters were put in the proof as exhibits and are sent up in the record. The counters were some 40 inches high, or, as one of the witnesses put it, ''about belt or waist high'' to an average man. The top of the counter was of glass and its sides were of wood. In the rear side there were small panels or sliding doors. A person of average height could stand in front of the counter, reach over, and open these doors, which moved noiselessly and were without locks at that time.

On display beneath the glass top were the diamond rings in small trays. A tray was in the shape of a rectangle about 6 inches wide and 8 inches long, bordered by a narrow black enamel frame stretching tight a velvet surface with small parallel slits in it in which the rings

were inserted and held in place. These trays were merely lying on the case floor under them, and could be easily removed with the diamond rings inserted.

At about 3 p.m. October 23, 1957, three men came into the store, ostensibly as customers. They were well-dressed and mild mannered. One of them, identified as defendant Ashe, was wearing black alligator shoes and carrying a light-tan briefcase. Another of them, identified as defendant Anderson, was wearing cuffs on his shirt sleeves, and he did most of the talking. The third one, who had on a very expensive Hamilton wrist watch, was identified as defendant Kalinka. A store employee, T. B. Miller, a jeweler and salesman, waited on them, and was assisted by another salesman, Flint Leverette.

Anderson said that he had a couple of friends getting married and he wanted to buy them a wedding present; that he had in mind a silver tray for about $100. Miller showed him a sterling silver tray and also a silverplate tray, each at about that price. Anderson said that he could not quite make up his mind which he had rather have, and wanted to talk to his wife over the telephone about it. He undertook to make a call on the phone there on the floor; but neither Miller nor Leverette heard what he said.

While these employees were showing Anderson the trays, the other two men walked and looked around in the store and at one time they sat down in chairs near the diamond counter. After a few minutes at the phone, Anderson came back to Miller, and said that he had been unable to reach his wife by phone, and that after talking with her that night he would be back the next day to buy the wedding present. These three men were at the store

some 45 minutes that afternoon, and left, saying they would be back next day.

On the next day (October 24) at about 11:30 a.m., the same three men, dressed as they had been the day before, Ashe still carrying the briefcase, came back to the store. Miller and Leverette were the two employees on the sales floor at that time. There were no other customers in the store. Miller asked Anderson if he could wait on them, and Anderson said, "Yes." He said his wife had bought a wedding gift the afternoon before, and he wanted to buy some little gift to supplement it. Miller showed him a cream and sugar set, which he bought, paid the price, $13.50, in cash, and Miller sent it downstairs to have it gift-wrapped for him.

Miller went out to lunch at 12 o'clock, leaving the other salesman, Leverette, there with the three men, who were waiting for the gift-wrapped package. While they were waiting and talking, Leverette asked what business they were in. They said they were in the "Home Installation Business." Then Anderson asked Leverette to show him a Ronson cigarette lighter, which he bought and paid for in cash, the price being $9.22. The gift-wrapped package was delivered to them, and they left the store about 12:15 or 12:20 p.m.

When they left, there was no customer and no employee on the main floor but Leverette. He went over to the diamond counter and started "touching up" or painting little chipped places in the enamel on the frames of the diamond trays, beginning at the right-hand end of the diamond case and working toward the center section, where there were two trays containing rings with the largest and most precious diamonds. When he touched

up the frames of *these two trays*, he noticed it was about 1 p.m., or his time to go to lunch.

At that time, Miller came back from lunch, and Leverette told Miller he had touched up or painted the trays in this diamond case, and asked Miller, if he should go into the case, "to be careful and not smear the enameling." With that Leverette went to lunch leaving Miller alone on the main floor, there being no other employee and no other customer on the floor at that time.

Miller went to the watch counter, sat down there, and began to repair a watch. About 1:15 p.m., the three defendants again entered the front door of the store, came back to the watch counter where Miller was, and one of them, Miller said, "made a crack" to the effect that "he had caught me (Miller) at work for a change." Anderson walked up in front of Miller, Kalinka walked over between Miller and the diamond case, and Ashe was walking and looking around.

While Anderson was standing in front of Miller and "Kalinka was standing between me (Miller) and the diamond case," both were talking; and Anderson said that he wanted to know the procedure for opening up a charge account at the store; that he would send his wife in to open the account and purchase some items she needed. Miller told him all that was needed was that the customer sign the sales slip and give two or three references. After about 5 or 6 minutes of such conversation, the three defendants left at about 1:20 p.m.

As they went out, a Mrs. Thacker came in. She wanted to buy a wrist watch for her son. Miller showed her the watch— laid it on the glass "right over the diamond counter where the most expensive diamonds were kept,"

looked down, and saw two diamond trays were missing. These were the trays that contained the rings with the largest and most expensive diamonds. Miller thus missed these two trays "just a short *minute or so* after these defendants left the store" (italics ours); and the diamonds in these two trays were of the value of $8,214.17.

On missing these diamonds, Miller sent for the manager, Mr. Wolf, who was at a nearby barber shop. Soon thereafter, Leverette came back from lunch; and he, Miller, and Wolf talked to the other employees in the store about the two missing trays of diamonds, to see if per chance any of them had taken the diamonds down to the diamond room and were cleaning them, when it was ascertained that none of them had done this and that these missing diamonds had been stolen.

They called the Memphis Police and the F.B.I. The offiers talked to the employees of the store; and Miller and Leverette gave them a statement and a description of defendants. Mr. Moore of the Memphis Police found on top of the diamond counter a palm print, which he raised and sent to the F.B.I. for investigation.

These officers sent out to all other police stations radiograms describing defendants and requesting photographs and fingerprints of any known jewel thieves with a like mode of operation. Five days later, or on October 29, the Memphis Police received, through the F.B.I. and the Kansas City, Missouri, Police, photographs of defendants Kalinka and Anderson. Some 5 or 6 days after the theft, Miller and Leverette were shown these photographs, with 11 others, and identified those of Kalinka and Anderson as two of defendants who had been at the store. A little later, the Memphis Police received a photo-

graph of Ashe, which was likewise identified by Miller and Leverette.

Defendants were later arrested in Kansas City, Missouri, and finally brought here for trial. Each of them denied to the officers that he had been in Memphis at the time of the theft of the diamonds. Upon being shown defendants in the police lineup with other persons, witnesses for the State identified each of defendants as the men who were in the store on the day of the theft and the day before; and the palm print taken from the diamond counter, when developed by the F.B.I., proved to be the left palm print of defendant Kalinka.

Evidence for the State was that on the day before, and the day of, the theft, defendants were seen together in three other stores in Memphis; that after they left one of these stores, a Leica camera was gone, and soon after they left another store, a pocket-size transistor radio was missing; and that their pattern of behavior in those other stores was similar to that of defendants at the Graves-Steuwer store. Employees of those stores were able to identify defendants in the police lineup and in the pictures.

As stated, defendants were arrested in Kansas City, Missouri, where they were known to Finas Sims, an officer of the F.B.I., who said he had often seen them together for the last 4 or 5 years. He interviewed them, and testified that Kalinka admitted that he was a shoplifter and had made his living in that way since he was 14 years old; that it was his practice to operate several hundred miles from Kansas City for about two or three weeks, and to return to Kansas City, sell his merchandise, and loaf there for a while.

Such is a summary of the evidence for the State. None of defendants chose to testify as a witness, and none of them offered any evidence in his behalf. The case was submitted to the jury solely on the State's proof.

■ We first consider the assignment of error by Anderson and by Ashe that the evidence preponderates against the verdict of guilt and in favor of the innocence of the accused. This assignment is formulated on the well-settled rule that this Court will not reverse a criminal case on the facts unless it is shown that the evidence preponderates against the verdict in favor of the innocence of the accused. Rule 14(7), 203 Tenn. 803-806; *Mahon v. State,* 127 Tenn. 535, 548, 156 S.W. 458, 461; *Turner v. State,* 188 Tenn. 312, 322, 219 S.W.2d 188; *Batey v. State,* 191 Tenn. 592, 596, 235 S.W.2d 591, 593.

■ The verdict of the jury, approved by the Trial Judge, accredited the testimony of the witnesses for the State, and established their credibility. *Ivy v. State,* 197 Tenn. 650, 652, 277 S.W.2d 363. It also displaced the presumption of defendants' innocence, raised a presumption of their guilt, and put upon them here the onus of showing that the evidence preponderates against the verdict and in favor of their innocence. *Ivy v. State,* supra; *Batey v. State,* supra; *Turner v. State,* supra.

So, with this rule in mind, we look to the evidence. While no one saw the theft as it was being committed, and none of the diamonds were recovered or found, still, taking the evidence for the State as accredited, it fully proves the crime as charged—the theft of the diamonds from the Graves-Steuwer store.

According to the witnesses for the State, the diamonds were in the two trays in the diamond case until about 1:15

p.m. when the three defendants came back to the store; and, seeing Miller was the only person in the store, Anderson engaged him in conversation, standing in front of him with Kalinka standing between him and the diamond case. While Anderson thus held his attention, talking about opening the account, Kalinka, standing at the diamond case, had an opportunity to open the door and take the two diamond trays, which were found to be missing only a "minute or so" after the defendants left the store.

In view of this opportunity, and of the fact that the diamonds were found to be missing only a "minute or so" after defendants left, and in view of the fact that there was no other person who could have taken the diamonds within this short interval, it would seem that the only reasonable inference from these facts is that Kalinka did take the diamonds at that time. This inference is strengthened by the fact that he left the print of his left palm on the glass immediately above where these two trays were taken.

■ So, we think the evidence for the State not only established the crime as charged, but also satisfactorily identified the defendants as the criminals who committed it; and that since they have not offered any evidence in denial, they have failed to show that the evidence preponderates against the verdict of guilt and in favor of their innocence.

We next consider the assignment of error based upon the admission of certain evidence. This assignment by Anderson is the same as the one by Ashe, except for their names. It is as follows: "The Trial Court violated the defendant Clarence Wade Anderson's constitutional

rights under the Constitution of the State of Tennessee and the Constitution of the United States by allowing grossly prejudicial, inflammatory, and incompetent evidence to be admitted against defendant, Clarence Wade Anderson."

Thus, neither does this assignment of error nor the motion for a new trial set forth any of the evidence, the admission of which is here complained of. But under a discussion of this assignment in defendants' briefs, they do refer to testimony of employees of other stores to the effect that these defendants came to such stores and that after they left certain articles were missing.

██ ██ We think that defendants cannot complain of the admission of this evidence because it does not appear that any objection was made at the time such evidence was offered. It is well settled that this Court will not consider an assignment of error based on the admission or exclusion of evidence unless timely objection and exception was made in the Trial Court and the Trial Court given an opportunity to make correction. Rule 14(5), 203 Tenn. 803, 805; *Turner v. State,* supra, 188 Tenn. 312, 322, 219 S.W.2d 188, 193; *Nichols v. State,* 200 Tenn. 65, 91-92, 289 S.W.2d 849, 860, and cases there cited.

Defendants Anderson and Ashe assert that the Trial Court erred in refusing to grant them a severance and a separate trial from that of defendant Kalinka. It is urged that this was error because the indictment against the three of them contained an additional count against Kalinka alone as an habitual criminal and that the evidence of his prior convictions, properly admissible against him, would greatly prejudice the defense of the other two defendants.

Counsel for Anderson, and counsel for Ashe, who did not represent defendants in the Trial Court, quote in their briefs what was said by the learned Trial Judge in overruling the motion of Anderson and Ashe for a severance. The Judge expressed the view that in the absence of a proper charge, there was "a possibility" that the evidence of Kalinka's prior convictions might be prejudicial to the other defendants; but that he was of the opinion that there would be no such prejudice if the jury were properly charged not to consider such evidence against the other defendants; and he stated that he would prepare such a charge and asked counsel for defendants to "draw the charge."

It does not appear, however, that such a charge was given by the judge to the jury, or that such a charge was drawn by counsel. The failure of either to do this was doubtless due to inadvertence, or to the idea that the certified copies of Kalinka's prior convictions in other cases would have no great bearing on the trial of this case; and apparently it did not; for, as we have seen, the jury acquitted him on the habitual criminal count.

█ The test of whether one charged with a joint crime is entitled to a severance is whether he would be unfairly prejudiced in his defense by being put to a joint trial; and this is largely a matter within the sound discretion of the Trial Judge, and his exercise of such discretion will not be reversed, unless it affirmatively appears that defendant was clearly prejudiced thereby. *Woodruff v. State,* 164 Tenn. 530, 538, 51 S.W.2d 843, 845; *Turner v. State,* 187 Tenn. 309, 316, 213 S.W.2d 281; *Kirkendoll v. State,* 198 Tenn. 497, 522-523, 281 S.W.2d 243, 254.

■ We think it does not affirmatively appear upon this record that the Trial Judge erred in refusing to grant a severance or that defendants Anderson and Ashe were prejudiced thereby. We think the jury would understand that the records of prior convictions of Kalinka in other cases would have no bearing upon the issue of the guilt of Anderson and Ashe in this case; and, as stated, it apparently had none at all, even against Kalinka, for the jury acquitted him on the habitual criminal count.

■ Defendant Ashe makes an additional assignment of error. He asserts that the Trial Court erred in overruling defendants' motions to be permitted to inspect the written statements given by the State's witnesses, Miller and Leverette, to the Memphis Police and to the F.B.I. This is urged to have been a violation of defendants' rights under the Constitution of the State and of the United States, upon the authority of *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103.

In the direct examination of Miller it appeared that shortly after the theft Miller had given a written statement and description of defendants to the Memphis Police and to the F.B.I. The bill of exceptions shows:

"Q. Mr. Miller, you also I believe—did you give a statement to the Police Department, a written statement? A. Yes, sir.

"Q. And to the Federal Bureau of Investigation? A. Yes, sir. (Tr. p. 83)

\*    \*    \*    \*    \*    \*

"Mr. Gandy: Mr. Battle, you may cross examine.

"Mr. Battle: If your Honor please, there is a matter of law I wish to discuss with you at this time.

"The Court: Gentlemen, go to your room; remain together, don't separate and don't discuss the case.

"(The jury retired from the Courtroom.)

"(The following occurred out of the presence and hearing of the jury.)

"Mr. Battle: Now, if your Honor please, I think a predicate has been laid. We would like the Court at this time to enter an order for the State to produce this witness' written statements given the Federal Bureau of Investigation and the Police Department, on the authority of Jencks against the United States.

"The Court: That is overruled.

"Mr. Battle: We respectfully note our exception."

During the cross-examination of witness Leverette, it was brought out that, as soon as the theft was discovered, the police were called. This witness was asked and answered as follows:

"Q. And they (Memphis Police) came out and you gave a statement? A. Yes.

"Q. You gave them a statement and you gave the Federal Bureau of Investigation a statement? A. Yes.

"Q. That was a written statement? A. There, yes.

"Mr. Battle: Now, if your Honor please, without asking the jury to retire for each of these witnesses that have given statements, I want to move that they be produced, and I assume that your Honor will rule the same way you have.

"The Court: Yes.

"Mr. Battle: To which we note an exception.

"The Court: Yes."

The above is all that appears in the record about this matter. Thus, it was not shown that such statements had been preserved, or still existed, or were in possession of the police or the F.B.I., or the State. Nor was there any showing why such statements were desired by defendants or how they might aid the defense, for they were certainly not admissible in evidence. Nor did the identification or conviction of defendants in anywise depend upon such statements.

In the absence of any showing to the Trial Judge that such statements were still in existence and were in some way relevant or needful to the defense, we think the Judge could not be put in error for overruling this motion, which seems to have been *pro forma* to invoke the Jencks case, which, however, was not concerned with state action or any rule for state courts but only laid down a rule for "administration of criminal justice in the federal courts" (353 U.S. 668, 77 S.Ct. 1013, 1 L. Ed.2d 1112).

All of the assignments of error are overruled and the judgments of the Criminal Court of Shelby County is affirmed. The costs of the appeals in error are adjudged against plaintiffs-in-error.