Claudius I. VERMILYE, Jr., Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee.

Feb. 26, 1979.

Certiorari Denied by Supreme Court July 2, 1979.

Philip M. Carden, Nashville, Joe S. Bean, Joe R. Hickerson, and C. Edward Murray, Winchester, for appellant.

William M. Leech, Jr., Atty. Gen., Robert L. Jolley, Jr., Asst. Atty. Gen., J. William Pope, Jr., Dist. Atty. Gen., Pikeville, Mike P. Lynch, Asst. Dist. Atty. Gen., Winchester, for appellee.

DAUGHTREY, Judge.

## OPINION

The defendant-appellant, Claudius I. Vermilye, Jr., was convicted of three charges of crime against nature and five charges of aiding and abetting crime against nature. The jury imposed sentences of five to ten years on the first three counts, and ten to fifteen years on the remaining counts. The trial judge divided the eight sentences into three groups, ordering those in each group to be served consecutively to the others, for an effective total sentence of not less than 25 nor more than 40 years imprisonment.

The defendant now appeals, raising numerous assignments of error, the most significant of which challenge (1) the trial court's failure to suppress evidence seized from the defendant's home, (2) the Court's denial of the defendant's motion for a continuance, (3) the sufficiency of the convicting evidence, (4) the propriety of the prosecutor's closing argument, (5) the correctness of the jury instructions, and (6) the validity of the consecutive sentences imposed by the trial judge. Moreover, the defendant insists that the combination of these errors together with the highly sensational, nationally publicized events surrounding the trial produced an atmosphere which deprived him of a fair trial and violated his right to due process of law. After a careful study of the record on appeal, we must disagree.

There can be no doubt that the facts of the case were sensational in nature. The State proved to the jury's satisfaction that the defendant, a seminary graduate and ordained Episcopal priest, had been running Boys Farm, Inc., supposedly a home for wayward and homeless boys, for some four or five years prior to his arrest. The home was not church-sponsored or related and seems to have been maintained largely from funds raised by Vermilye from the sale of photographs and slides of the children to some 200 or more "sponsors." These photographs depicted the boys (most of whom were eleven to sixteen years of age when photographed) posed in the nude and engaged in various acts of simulated or actual fellatio and sodomy. This situation apparently came to light when local authorities received information that solicitations for contributions and pictures originating from Vermilye's Boys' Farm had appeared in various homosexual publications and pornographic magazines, and that similar evidence had been uncovered elsewhere as a result of investigations into an alleged national child pornography ring. An investigator from the local District Attorney's Office secured a search warrant and, as a result of its execution, seized various items from the Farm, including developed and undeveloped photos of the residents, corre-

spondence between Vermilye and his "sponsors" and between the boys and the "sponsors," and card catalogs containing several hundred names of past and present financial contributors from across the country. T.B.I. agents and local investigators conducted out-of-state interviews with a large number of "sponsors," several of whom ultimately testified at trial in exchange for a grant of immunity from prosecution in Tennessee.

These witnesses introduced several hundred photographs and various pieces of correspondence, some of it lurid in its content, as exhibits to their testimony. They also told of personal visits to the Farm when they would spend the night with individual residents, engaging in various homosexual acts with the youngsters. Some of these sexual encounters were photographed by the sponsors; others were photographed by the defendant in the sponsors' presence.

Several of the ex-residents of the Farm also testified for the State. The boys described monthly photography sessions, during which the defendant would pose them in various homosexual activities and then photograph them, mailing out sets of pictures developed by Vermilye (sometimes with the boys' assistance) in a dark room located in the attic of the Farm's A-frame residence. These photographs would be "purchased" by the boys' sponsors at advertised prices, which were normally collected in addition to regular monthly contributions.

From the record it appears that some of these boys were placed at Boys' Farm by various courts and welfare agencies; others were "placed" there by their parents. In all cases, according to those who testified at trial, their homosexual activities were wholly consensual in nature. Not one of them testified to the use of force on Vermilye's part, although one child said that it was understood that participation in the photography sessions and in the sponsors' visits was necessary if he wanted to continue living at the Farm. Several of the boys testified to homosexual acts committed with the defendant, but none of these was ever photographed. As Vermilye explained to a patron of the Farm, such pictures "would be too hard to explain to the Bishop."

The defendant testified at trial and denied knowledge of or any responsibility for most of the photographs and slides introduced by the State. He said that he had taken a few photographs of the individual residents, posed nude, to supply an artist who needed them for life drawings, and to use in "sublimation" counselling with his homosexual "clients," whom he was trying to help stay "closeted" by fueling their homosexual fantasies with nude pictures of his own son, as well as residents of the Farm. He disclaimed responsibility for all other photographs, insisting that the Farm had been infiltrated by agents of a national "child porn" ring. He said that the boys themselves had developed and mailed many of the photographs at issue. Vermilye attempted to explain the rather lurid nature of correspondence found on his desk and mailed by him to various sponsors as the result of therapeutic "role-playing" with clients. He offered the testimony of one of the former residents of the Farm to corroborate his own testimony, and he presented two character witnesses.

■ We deal first with the defendant's contention that the search and seizure of items from the Farm was illegal because of a void warrant. This assertion is not borne out by the record. The warrant contains a careful and detailed description of the premises to be searched and the kinds of items to be seized ("evidence of such crimes [T.C.A. § 39–707 and § 37–254] including photographs and negatives of photographs, movie films and negatives thereof, photographes [sic] and film development equipment, records and correspondence to 'patrons' evidencing the forwarding or mailing of pictures depicting homosexual acts between said minors including fellatio and sodomy, and all records, journals, and correspondence evidencing monitary [sic] charges for such films, photographs, and other unlawful 'services' provided to such patrons or sponsors by the

said defendant. . . ."), and there is no justification for branding it a "general warrant." There is, of course, no prohibition against the seizure of other property not specifically mentioned in a valid warrant *if* it is relevant to the crime suggested by the warrant. *Armstrong v. State,* 548 S.W.2d 334 (Tenn.Cr.App.1976); *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

■ Nor do we conclude that the affidavit fails to establish probable cause, as the defendant alleges, or that it is deficient in any other material respect. The officer's affidavit was based on information provided by out-of-state law enforcement officials and by a named informant who had formerly been a resident at Boys' Farm. The details provided in the affidavit are more than ample to establish circumstances upon which to consider both the information and the informant reliable. See generally *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *State v. Little,* 560 S.W.2d 403 (Tenn.1978). And the facts alleged are clearly sufficient to establish probable cause.

■ Contrary to the defendant's contention, there is no evidence in the record to suggest illegal execution of this warrant. Undoubtedly this stems from the fact that the issue was not raised and fully explored in the trial court and thus an adequate record was not developed on this point.

■■ The defendant's assignment of error by which he alleges that his motion for continuance was improperly overruled cannot be reviewed on appeal. The defendant insists that the trial should have been continued to allow the effects of widespread pretrial publicity to dissipate. However, the voir dire of the jury is not included in the record, and we must therefore presume that the jury actually selected (and accepted by the defendant) was properly chosen and that it was composed of fair and impartial jurors.

■ Alternatively, the motion to continue was based on the absence of a defense witness who was "away in the military" and whom defense counsel said he had not had time to subpoena. However, the motion was not accompanied by an affidavit specifying the substance of the missing witness's proposed testimony, as required by T.C.A. § 19–413, nor was there any representation concerning it. We therefore conclude that there was no abuse of discretion in the trial court's decision to deny a continuance. *Woods v. State,* 552 S.W.2d 782 (Tenn.Cr.App.1977); *Maxwell v. State,* 501 S.W.2d 577 (Tenn.Cr.App.1973).

■ The defendant next complains that the only proof of individual acts charged in the indictments was supplied by the uncorroborated testimony of admitted accomplices, citing *Sherrill v. State,* 204 Tenn. 427, 321 S.W.2d 811 (1959). We can only conclude, after a study of the record, that each of the offenses for which the defendant was convicted was massively corroborated by both direct and circumstantial evidence. It follows that the trial court committed no error in failing to direct a verdict of acquittal and in overruling the defendant's motion for a new trial.

■ The defendant complains of comments made by the prosecutor during closing argument, concerning the existence of a child "pornography ring" or "chicken game." The record fails to disclose that an objection was made to this comment, and review on appeal is therefore foreclosed. *Rye v. State,* 532 S.W.2d 941 (Tenn.Cr.App. 1975). But even if an appropriate objection had been entered, any error in this regard would have to be considered harmless, given the overwhelming proof of the defendant's guilt in this case.

■ We have closely reviewed the jury instructions given by the trial court, especially those now assailed by the defendant concerning aiding and abetting, presence, corroboration of accomplice testimony, lesser included offenses, and the court's definition of the specific crimes against nature involved in this case. In each instance the

charge constitutes an essentially correct statement of Tennessee law. Furthermore, there were no special requests submitted by the defendant. It follows that there was no error in connection with these instructions. *Taylor v. State,* 544 S.W.2d 897 (Tenn.Cr. App.1976); *Turner v. State,* 188 Tenn. 312, 219 S.W.2d 188 (1949). The defendant's allegation that the crime against nature statute, T.C.A. § 39–707, is unconstitutional provides no basis for an attack on the jury charge, since this question has been previously determined by the courts and the statute has been found to be valid. *Young v. State,* 531 S.W.2d 560 (Tenn.1975); *Stephens v. State,* 489 S.W.2d 542 (Tenn.Cr. App.1972); *Rose v. Locke,* 432 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). Finally, the trial judge committed no error in failing to charge on contributing to the delinquency of a minor, having directed a verdict on this offense prior to submission of the case to the jury.

 The defendant next contends that the trial court violated the rule in *Gray v. State,* 538 S.W.2d 391 (Tenn.1976), by ordering some of the sentences imposed by the jury to be served consecutively. However, the record amply demonstrates, as the trial judge noted, a four or five year course of dealing by the defendant that makes him a persistent and repeated offender, who derived most (if not all) of his livelihood from the sexual exploitation of these children. The pervasiveness of the illegal behavior in this case is much broader than that in *Bethany v. State,* 565 S.W.2d 900 (Tenn.Cr. App.1978), and under the authority of the opinion in that case, we have no hesitation in upholding the method of sentencing employed here.

Finally, the defendant alleges that the record as a whole demonstrates that he was deprived of a fair trial. We have examined the dozen or so examples cited by defense counsel in support of this contention. In virtually every instance, there was no objection to the questioned procedure at trial and no related assignment in the motion for a new trial. We conclude that the complaints, taken individually and as a whole, fail to prove the denial of a fair trial. As noted above, there can be little doubt about the sensational nature of the subject matter of this trial; as the trial judge concluded with a grim seriousness detectable even on the written record, "We are not dealing in daisies." Nevertheless, it appears that the trial was concluded in as fair and businesslike a fashion as could be expected, given the nature of the charges and the proof. As the trial judge also noted, the defendant's trial could not and did not take place in a vacuum. We find that the court made every reasonable effort to see that the defendant received a fair trial, and we uphold the resulting conviction.

The judgment of the trial court is affirmed.

WALKER and CORNELIUS, JJ., concur.