LESTER H. BRENNER

*v.*

STATE OF TENNESSEE.

398 S.W.2d 252.

(*Jackson,* April Term, 1965.)

Opinion filed December 9, 1965.

428

HAL GERBER and MARSHALL GERBER, Memphis, GERBER & GERBER, Memphis, of counsel, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, and ROBERT F. HEDGEPATH, Assistant Attorney General, for the State.

MR. CHIEF JUSTICE BURNETT delivered the opinion of the Court.

Plaintiff in error was indicted, found guilty of forgery of an instrument not exceeding the value of one hundred ($100.00) dollars, and was sentenced to serve not more than five years in the State penitentiary. From this conviction an appeal has been seasonably perfected, able briefs filed and arguments heard.

The facts out of which this indictment arose are that there was an election held in Shelby County on November 7, 1963. This election was under the direction of the Shelby County Election Commission, which has three members, a Chairman, Secretary and third member. The plaintiff in error is the Secretary of this Commission. The record shows that for many years in Shelby County the Secretary of the Commission has been given the responsibility of handling practically all of the administra-

tive responsibilities of the board at election time, and for this he is given additional compensation.

Since voting machines are being adopted by all large cities and they are in use in Shelby County, it has become necessary for the Election Commission to hire instructors whose duty it is to be available at the polling places on election day and give instructions to persons who do not know how to use the voting machines. Normally such instructors are more in demand in the colored neighborhoods where persons are not accustomed to voting. Prior to this election the plaintiff in error had hired numerous persons as voting machine instructors. Those hired attended a schooling session which last from fourteen to sixteen days, and they were paid $10.00 per day for attending this school. In addition to the voting machine instructors the Election Commission, acting through its Secretary, has for a long time had the responsibility of seeing that workers were available at the polls to handle the voting processes with respect to polling books, etc. This in a large county like Shelby is indeed a very sizeable job and there are generally from two to three thousand persons hired to conduct the election in the various wards and precincts throughout the county.

On the day of the election in question, November 7, 1963, as is generally true, a number of persons who had been contacted to work didn't show up. Under such circumstances the practice has developed that in each voting place the chief official selects certain persons to fill in as workers for that day. In view of this fact that these people are put to work on the day of the election a development has grown up in Shelby County for the officer in charge of the voting place to complete a "Payroll Sheet" which is turned in with the poll books, etc., immediately

after the election, to the County Courthouse. These payroll sheets are then turned over to the Election Commission in order that the names of the workers to be paid by the county can be verified and authenticated by the Election Commission.

In the election in question the Commission's office received the payroll sheets immediately after the election, checked to see that the names were legible, and prepared envelopes which were to be used later for mailing county warrants to the individuals who had worked in the election. These payroll sheets were then sent to the office of the Chairman of the County Court—he is the chief financial agent for the county. It is the responsibility of his office to prepare and issue county warrants for debts of the county. After the election the Chairman's office prepared the warrants and sent them back to the Commission's office in order that they could be mailed to the respective payees.

According to the testimony of one of the secretaries of the plaintiff in error, a Mrs. Glanville, the plaintiff in error presented her with a list made out on a yellow legal pad of approximately sixty names which he directed her to add to the various payroll sheets which were to be sent to the County Chairman's office so that the persons on this list could be paid ten dollars each for working in the election. The names on this list were made out in the handwriting of plaintiff in error, and, contrary to the normal procedure, there were no addresses listed to. the side of the names of the particular persons. Another secretary in the office of plaintiff in error verified this testimony as did plaintiff in error himself in his testimony. Mrs. Glanville testified, with reference to this sheet which had no addresses on it, that the plaintiff in

error told her: ''After I told him we would have a little controversy about it, he said it would be all right to add addresses.'' Thus Mrs. Glanville testified that she just picked addresses at random and out of the thin air and included them in the payroll list that went to the County Chairman's office.

A Mrs. Ragsdale, who is likewise a secretary to plaintiff in error, helped in preparing these lists of employees at the polls. She received some of the names which plaintiff in error had added and was expected to include them on some of the payroll sheets for the purpose of having county warrants issued to the particular persons. Mrs. Ragsdale, in adding the names from the list given her by the plaintiff in error, did not put addresses on the payroll sheets. She testified: ''I said, 'Well, what ward and precinct,' and he said, 'Just start copying one at the bottom of the sheets here,' and I thought nothing about it.''

Plaintiff in error, when he took the stand as well as in a statement that he gave the District Attorney General, admitted that he had prepared a list of names and directed the two secretaries to add them to the various payrolls which were to be sent to the County Chairman's office. He said after the election was over he received a number of calls telling him certain persons had worked and that he should put their names on the lists for pay. He did not remember from whom he received these calls nor did he obtain any addresses for the names of the particular persons who worked. He testified that he assumed these persons would come down to the election office and pick up their checks since this was not an unusual practice.

There is no question in this record but that all of the names submitted to the County Chairman's office, both for the workers in the election whose names were added to the payroll sheets and the instructors at the voting machine places, were submitted at the direction of the plaintiff in error. Plaintiff in error likewise prepared two letters which listed the names of persons who had attended the voting machine instructor's school. Each of the persons who attended the voting machine instructor's school were to be issued a warrant for ten dollars per day for sixteen days or a warrant for $160.00. The plaintiff in error admits that he wrote two letters to the Chairman's office authorizing the issuance of these warrants. Thus it is that it clearly appears that each of the names that were added to the payroll sheets were added at the direction of the plaintiff in error, and certain of the names included in the voting instructor's list were of fictitious persons.

The State in its evidence in chief introduced voluminous proof which shows that persons included were not residents of Shelby County, were unknown to the neighborhoods near the voting precinct, and could not be found in the city directory or by the police department. It was likewise shown that the addresses picked out of the thin air by the secretary of the plaintiff in error were in some cases vacant lots, and at least in one case was the garage of the trial judge in this case.

After the warrants were drawn to these workers, as well as the warrants which were drawn to the fictitious persons, they were returned to the Election Commission office and the warrants which were drawn to actual persons were mailed out by the secretaries of the plaintiff in error. The warrants made out to the names which had

been added to the list at the direction of the plaintiff in error were not mailed; they were held out at direction of the plaintiff in error. Plaintiff in error told the secretaries in his office to put these warrants in a brown envelope and put them in a filing cabinet. At the time they were filed away, none of them was endorsed and the testimony from the secretaries is that they never saw these warrants again. The warrants for the voting machine instructors were not returned to the commission office.

The proof shows from the chief officers at the various polling places in the county that at the close of the day they had all the persons who had worked in that particular election to sign their names on the particular payroll sheets and to put their address thereon. These officers in the various polling places were personally acquainted with the persons who had worked and could identify each of them, with the exception that every officer testified that he had not heard of, nor did the person work, whose name was added to the particular payroll sheet by the Election Commission's office. In other words, the names which were added in the Election Commission's office to the payroll sheets were of persons of whom the chief officer had never heard.

There were seven indictments returned against the plaintiff in error but he was only charged in one of these indictments with the crime of forgery, and that was on a warrant payable to Frank P. Nicholson. The chief election official for Ward 34 testified that this Frank P. Nicholson, whose name was on the payroll sheet for that particular ward and precinct at the direction of plaintiff in error, did not work in the election and that the name was not on the list at the time he, the chief election offi-

cer, signed it as official. There are some several volumes of this large transcript made up of this type testimony. As said above, it is only on the one warrant issued to Frank Nicholson that this plaintiff in error was tried and convicted.

There were a number of samples of the handwriting of plaintiff in error exhibited to the jury which was ruled to be a standard of his writing in the trial. The State then put on an F.B.I. handwriting expert on the questioned documents, especially the Frank P. Nicholson warrant. The usual qualification was gone through and this F.B.I. agent qualified as an expert. He testified at great length as to the similarity between the endorsement of the Frank P. Nicholson warrant and the standard which had previously been introduced and accepted by the court as the writing of the plaintiff in error. He said this:

A. "I was requested to compare the Frank P. Nicholson endorsement and the Henry B. Eastman endorsement on the back of the two warrants, with the handwriting appearing on these various exhibits, to determine if there was any evidence they were written by one and the same person.

Q. "Did you find any evidence of that, Mr. Mesnig?

A. "Yes, I did."

An officer of a local bank in Memphis testified at the time these things were happening in November, 1963, she was a teller at this bank. She says that plaintiff in error cashed this $10.00 warrant, which had been made payable to Nicholson, and that about the same time he brought in thirty-two other $10.00 warrants and asked

her to cash them for him. She had known the plaintiff in error for a number of years and had been used to handling his business at the bank. She says she asked him about his endorsement on the check and he said that he preferred not to put a second endorsement on this group of thirty-two drafts. She likewise testified that on November 9, 1963, he cashed seven more of these $10.00 warrants and told her at that time that he had cashed them for the payees and wanted his money back. She further testified that she cashed a warrant for the plaintiff in error on December 9, 1963, three other warrants of $160.00 each for plaintiff in error on November 1, 1963, and that on November 5, 1963, she cashed five warrants for $160.00 each for the plaintiff in error.

The Chief Clerk in the office of the County Chairman testifies that plaintiff in error personally picked up eight warrants in the amount of $160.00 each from the office of the County Chairman.

The plaintiff in error is a man who had been practicing law for some thirty-five years. He gave a voluntary statement to the District Attorney General which is consistent with the testimony that he gave on the witness stand, and it likewise coincides with the testimony of the two secretaries in his office, about his adding the names, etc. Plaintiff in error further says that none of the warrants were endorsed at the time he received them from the Chairman of the County Court, and he testified that he cashed several of these warrants but that on each occasion he was accompanied to the bank by some person who had requested him to cash those particular checks. He further says, after those warrants were returned to his office and filed away, several persons came to the office and obtained their warrants and that he

cashed several of these warrants and had the bank teller cash some of them for him and put the money in envelopes. He denied endorsing any check.

The only evidence he has aside from his own statements are numerous character witnesses who testified as to his good character, and he likewise says that he. received a number of calls after the election, and as a result of these calls had the secretaries include the names received on the lists as testified to by these secretaries. He says that after the warrants were issued a number of persons picked up their warrants and, subsequent to that, calls were received from persons requesting that he cash their warrants for them and that he did this. He says that some of the persons who came to his office brought a large number of warrants with them and that he accompanied them to the bank and had the warrants cashed at the teller's window, heretofore referred to. He testifies that he gave the eight warrants, which he had picked up from the County Chairman's office, for $160.00 each, to a third person, to-wit, a Mrs. Lola Lee, who was the supervisor of the voting instructors. Mrs. Lee didn't testify in this case.

Of all these warrants introduced in evidence the expert was only able to definitely say that in his judgment or opinion, after going into why, etc., that the Nicholson and Eastman warrants were the only two endorsed by plaintiff in error. Objection was made all the way through as to the introduction of all these other warrants on the ground that they were introducing evidence of other forgeries or incidents of uttering forged paper and, it was argued, that the State could not show that they were all part of a scheme. The trial judge overruled this objection and admitted them on the theory that

they were logically connected with the incidents of uttering the warrant upon which the indictment is primarily predicated, and that under this record these were all part of a scheme, and thus admissible.

 The usual assignment is made that the evidence preponderates against the verdict and in favor of the innocence of the accused. We think that the evidence overwhelmingly supports the verdict. Be that as it may, there was ample, material, logical evidence introduced upon which the jury based its verdict, and, when the jury has thus found, and their verdict has been approved by the trial judge, the presumption in favor of the innocence of the accused has disappeared, and he comes here with a presumption of guilt. The burden is upon him to show that the evidence preponderates against such a verdict and in favor of his innocence. *Cooper v. State,* 123 Tenn. 37, 138 S.W. 826, and many, many cases which may be found by Shepardizing the Cooper case. It is likewise true that the credibility of the various witnesses has been established by the jury's verdict and they have seen fit, and we think correctly so under this evidence, to believe the evidence of the State.

The only evidence which plaintiff in error has offered to conflict with that of the State was that certain persons unknown to him requested that he have these warrants cashed for them. He testified that they accompanied him to the bank and received the money after they were cashed. He didn't bring in any of these people. He just merely made this statement. Of course, under such circumstances, it was perfectly natural for the jury to choose not to believe this defense. Under the circumstances and evidence we have heretofore detailed, this assignment and theory certainly must be overruled.

■ It is next argued that the verdict resulted from passion, prejudice or unaccountable caprice. We certainly cannot see how this could be. Of course, the argument is that basically the jury wouldn't have given this man five years for merely cashing one $10.00 warrant. In other words, their argument is that all these other warrants, which were cashed by him but not shown to have been endorsed by him, prejudiced his rights herein and caused the jury to render this large verdict, and thus it was based on prejudice, etc., as said above. The punishment for forgery and for larency are the same. T.C.A. sec. 39-1721. T.C.A. sec. 39-4204 sets out the punishment for petit larceny as being from one to five years. The jury fixed the punishment of plaintiff in error at imprisonment in the State penitentiary for not more than five years. Under this record we cannot see how this in any way evinces passion, prejudice, etc., because the punishment is not beyond what the statute fixes.

The third assignment is basically the major defense herein and is likewise tied in with the previous assignment just referred to. It is to the effect that the trial court erred in allowing this evidence, heretofore detailed, of like incidents to be introduced in the trial. In Wharton on Criminal Evidence, Vol. I, sec. 233, page 500, it is said:

"If evidence is competent, material, and relevant to the issues on trial, it is not rendered inadmissible merely because it may show that defendant is guilty of another crime. Such evidence is not admitted because it is proof of the other crime, but because of its relevancy to the charge on trial." (Citing cases from

practically every State in the Union, including that of *Mays v. State,* 145 Tenn. 118, 238 S. W. 1096).

Further, at page 502, the author says:

"The admissibility of such evidence, however, is within the discretion of the trial court, and will not be reversed in the absence of clear error, or of proof that prejudice has resulted from the error."

In the same Volume at page 519, the author says:

"In forgery cases, evidence of other forgeries is not admissible and cannot be considered for the purpose of establishing the act of forging or uttering the instrument charged in the indictment, but when the fact of the false making or uttering of a forged instrument has been shown, evidence of collateral forgeries or uttering of forged instruments of like description is admissible as tending to show the intent with which the false making was done, or the guilty knowledge of the defendant in the uttering the instrument named in the indictment."

Again at page 523 of the same Volume, it is said:

"When an act is equivocal in its nature, and may be criminal or honest according to the intent with which it is done, then other acts of the defendant, and his conduct on other occasions, may be shown in order to disclose the mastering purpose of the alleged criminal act."

██ The evidence, of course, is used for limited purposes as above said. In this case the man was put on trial for both forgery and passing a forged document. This document was one of a large number of county warrants which were issued at the same time and under

similar circumstances. Under all the proof detailed in the trial below we think it was clearly proper and right for the trial judge to have admitted such testimony. All of this testimony had a logical connection between the crime as charged and the things done in those particular incidences.

Our statute, T.C.A. sec. 39-1701, defines forgery, as follows:

"Forgery is the fraudulent making or alteration of any writing to the prejudice of another's rights."

Blackstone defines forgery, 4 Commentaries, 247, as:

"* * * the fraudulent making or alteration of a writing to the prejudice of another man's right, * * *."

Thus it is, we see that our statute is practically a copy of Blackstone's definition of forgery. In order to establish the crime of forgery a fraudulent intent on the part of the accused is essential. *State ex rel. Barnes v. Stillwell,* 165 Tenn. 174, 54 S.W.2d 978. It was thus necessary to show this particular forgery in this instance, and that it wasn't a mistake and that he wasn't qualified to endorse the warrant and all these other things which surrounded the act, and to show a fraudulent intent on the part of the accused in doing these things.

This large record convinces us that this proof introduced by the State was either pertaining to the crime for which plaintiff in error was on trial or logically connected with it in some manner. The trial court, in overruling the motion of the plaintiff in error to exclude this evidence, pointed out that the evidence which was admitted could be admitted for the purpose of showing the

fraudulent intent on the part of the plaintiff in error, and because these acts were all part of one scheme or swindle. It seems clear to us from this record that plaintiff in error was undertaking to defraud the county out of a large sum of money through this scheme that he had evolved with all these different county warrants which were made payable to fictitious persons and later endorsed, or passed by plaintiff in error. Clearly, under this record there is just on inference, that is, that these people did not exist. If such things had been done honestly, a man of the intelligence of this man certainly would have shown, under a charge of this kind, that these people were in existence.

The next assignment of error is tied in with this third assignment and the same answer goes for this assignment of error, which is to the effect that the trial judge erred in instructing the jury that they could consider this evidence submitted by the State which related to the documents or warrants other than the warrant on which the plaintiff in error was tried. The same answer goes for both assignments.

We find an excellent note relating to the subject in 34 A.L.R.2d, 777, and on page 780 the writer of this note says:

"The rule that evidence of another offense is not admissible in a criminal trial has been recognized in the vast majority of cases considering the matter as subject to the limitation that, in forgery prosecutions, evidence of other acts of forgery is admissible, particularly for purposes of proving intent or motive, scienter or guilty knowledge, or identity, or of showing that the forgery

charged was in conformance with a system, scheme, or plan, or to develop the res gestae."

■ The charge of the court complained of in the last assignment is merely of the trial judge telling the jury almost exactly what has been quoted above, this is, what they could consider this evidence for. Clearly, to our mind the instruction was correct and a proper exposition of the law to the jury.

After one reads this record he becomes convinced, under the evidence offered herein and these various circumstances, which are so strong, that the evidence is clear and persuasive against the plaintiff in error with respect to all of the things which we have enumerated. The warrants introduced at the trial, other than the one made to Nicholson, were obviously swindles against the county and brought about by the plaintiff in error. They all grew out of the same election. Plaintiff in error had control of the process necessary to initiate payment to these non-existent persons and admitted cashing these warrants. It seems to us that the introduction of the evidence of these incidents, other than the one for which the man is on trial, was not error. We recently said in *Johnson v. State*, 208 Tenn. 311, 345 S.W.2d 883, that:

"There was evidence offered in this case of numerous other similar offenses to that here committed. Under our authorities on this type of case, it is perfectly proper to admit such evidence to show a scheme or design on the part of the plaintiffs in error, and such a showing does not constitute error."

■■ There is much argument to the effect, and forcibly made, that the expert here should not be given much credit. He had to take letters, symbols and things of

that kind. Suffice it to say, he was qualified sufficiently to satisfy the trial judge that he was an expert of such things, and the reading of his qualifications convinces us unquestionably that he was entitled to testify as an expert. When one does thus qualify as an expert to give such testimony his testimony is tested by the same rules that are applied to other witnesses and its weight and value are for the jury to determine.

It is next very forcibly argued that these election payrolls from which these vouchers, drafts, etc., were written were invalid. In other words, what is being argued is that there could be no forgery of a document which has no real or apparent legal effect. T.C.A. sec. 2-1107 sets forth the lists of election officials made by the county commissioners, who shall issue warrants, etc. It is said that this practice, which had grown up in Shelby County, did not comply with this Code Section, and thus by making out the list, which was referred to in the outset of this opinion, by these secretaries and these warrants issued on it, it did not actually comply with this Code Section, that it is illegal, and any warrants based on this list, since the right to issue them is illegal, could not be a forgery by this fact. The Code Section just referred to makes it the responsibility of the Election Commission to certify the names of persons who worked in the election to the Chairman of the County Court who issues these vouchers in order that the Election Commission can pay these people who worked. There is no mention in this Code Section of the necessity of getting the names of the workers from the poll books. The Section merely requires that a complete list of the workers in the election be submitted, subsequent to the time when the returns

of the election are deposited with the Election Commission. This requirement was complied with.

■ The record shows that the County Election Commission had years ago adopted the procedure followed herein of having the chief officer in each voting place prepare a list which would include the names of everyone who worked at this particular place. It is also clear that the Secretary of the Election Commission had acted for the Commission for many years in respect to this type of administrative duty, as plaintiff in error had for years submitted the payroll to the Chairman's office. The payroll lists, which were submitted by the plaintiff in error to the Chairman of the County Court, subsequent to the election were valid. It seems to us that this being true the warrants issued by the Chairman of the County Court were valid documents having legal effect.

Next it is very ably contended that the trial court erred in not allowing plaintiff in error to examine statements made by one of the witnesses prior to the trial. The question is whether or not the failure of the trial judge to require the State in this kind of proceeding to produce at the trial written statements made by the State's witnesses to the District Attorney General's investigator, after showing that such statements were made, constituted a denial of the rights of the plaintiff in error. In support of the argument on this assignment the plaintiff in error relies primarily on *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. The question presented in the Jencks case was before us recently in another case, that of *Anderson v. State,* 207 Tenn. 486, 341 S.W.2d 385. In that case this Court said:

"* * * Thus, it was not shown that such statements

446

had been preserved, or still existed, or were in possession of the police or the F.B.I., or the State. Nor was there any showing why such statements were desired by defendants or how they might aid the defense, for they were certainly not admissible in evidence. Nor did the identification or conviction of defendants in anywise depend upon such statements.

"In the absence of any showing to the Trial Judge that such statements were still in existence and were in some way relevant or needful to the defense, we think the Judge could not be put in error for overruling this motion, which seems to have been *pro forma* to invoke the Jencks case, which, however, was not concerned with state action or any rule for state courts but only laid down a rule for 'administration of criminal justice in the federal courts'."

■■■ We think this was the proper application of the rule, and when we consider the facts of this case we think the Jencks case has no application whatsoever here. The Supreme Court of the United States in the Jencks case was merely applying it to the administration of criminal justice in the federal courts. In the case now before us the State's witness did not testify regarding the statement he made to the District Attorney General's investigator. This same witness made a statement to counsel for plaintiff in error as well as to the District Attorney General's office. Thus, it is, under such circumstances, we cannot possibly see how this is error or prejudiced the rights of the plaintiff in error in any way.

For the reasons expressed herein the judgment below must be affirmed.

CRESON, JUSTICE, not participating.