# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 15, 2013

## STATE OF TENNESSEE v. CAMERON COOK

**Appeal from the Criminal Court for Knox County**
**No. 97481     Jon Kerry Blackwood, Judge**

_____

**No. E2012-02617-CCA-R3-CD - Filed February 21, 2014**

_____

The Defendant, Cameron Cook, was convicted by a Knox County jury of attempted first degree murder and employing a firearm during an attempt to commit a dangerous felony for which he received an effective sentence of thirty years confinement.[1] In this appeal, the Defendant argues that the evidence is insufficient to sustain either conviction and that the trial court erred in refusing to charge the jury on voluntary intoxication. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and JEFFREY S. BIVINS, JJ., joined.

Joseph Liddell Kirk, for the Defendant-Appellant, Cameron Cook.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randall Nichols, District Attorney General; and Takisha Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

---

[1] The Defendant was initially indicted and tried for two counts of evading arrest, attempted first degree murder, two counts of employing a firearm during an attempt to commit a dangerous felony, theft, driving with a suspended license, possession of cocaine, and possession of marijuana. On March 2, 2012, a Knox County jury convicted him of two counts of evading arrest, one count of employing a firearm during an attempt to commit a dangerous felony, driving with a suspended license, possession of cocaine, and possession of marijuana. The jury acquitted him of theft. The jury was unable to reach a verdict on the remaining counts of employing a firearm during an attempt to commit a dangerous felony and attempted first degree murder, causing the trial court to declare a mistrial as to those counts. On May 29, 2012, following a second trial, the Defendant was convicted as charged for attempted first degree murder and employing a firearm during an attempt to commit a dangerous felony.

## OPINION

On February 26, 2011, Officer Andrew Olson of the Knoxville Police Department was on patrol when he received a call from another officer that the Defendant was driving a stolen green Volkswagen. Officer Olson was aware that the Defendant had an outstanding arrest warrant at the time. Officer Olson observed a green Volkswagen driving in the opposite direction on Martin Luther King, Jr. Avenue and began following the car in an attempt to verify whether it was the stolen vehicle. He lost sight of the car for about a minute and then caught up with it at a red light. As Officer Olson positioned his car behind the Volkswagen at the red light, the driver, later determined to be the Defendant, ran the red light. Officer Olson activated his blue lights, and a pursuit ensued. Officer Olson reported the pursuit to dispatch and requested assistance from additional officers.

During the pursuit, Officer Olson observed the Defendant make several movements toward the passenger side of the car "not typical with operating a vehicle." The Defendant pulled his hood of his sweatshirt up on his head, turned down several streets, and then turned west onto Washington Pike. The Defendant abruptly stopped the car and got out with a shotgun. Officer Olson exited his car and the Defendant shot him in the leg. He crawled to the back of his car and observed the Defendant flee on foot into a nearby neighborhood. At that time, other officers arrived on the scene and rendered aid to Officer Olson.

George Donahue testified that on the day of the offense he was traveling east on Washington Pike when he saw a green Volkswagen being pursued by a police car. He said, "[T]hey pulled out in traffic[] [a]nd the [Defendant] jumped out of the car, went toward the rear. And I heard [a] sound like two gunshots . . . [T]hen [the Defendant] turned, r[a]n back toward me carrying the shotgun in his right hand." After the Defendant fled the scene, Mr. Donahue got out of his car to check on the police officer and saw that the officer was "bleeding pretty bad" from a wound to his right leg.

Lisa Lane testified that her family owns a store on the corner of Washington Pike and Alice Bell Road, very close to where the offense occurred. She stated that on the morning of the offense, she drove to her family's store with her young son to pick up a few items. As she was about to leave the parking lot, she heard a police siren and saw a police car following a green car. She thought it was a routine traffic stop and looked down to get her keys. She then heard a gunshot and looked up. She saw a man, whom she identified in court as the Defendant, standing diagonally to the police car and observed him fire a second shot in the direction of the police car. She recalled that the gun was pointed "directly to [] the front door. . . directly to the policeman." She explained that it really scared her because "it was a really big rifle and  I knew being that close, it was just too dangerous that – that the policeman had to be shot or killed, hurt." After the Defendant shot the police officer, he ran

in the opposite direction, towards Ms. Lane and her son. She quickly pulled out of the parking lot and drove away, keeping an eye on the Defendant in the rearview mirror. She observed the Defendant carrying the gun as he ran from the scene. On cross-examination, she acknowledged that she did not see the first shot and could not recall whether the police car door was open or closed at the time of the shooting.

Matthew Turner testified that on the morning of the offense, he was traveling on Washington Pike when he saw a police car with its blue lights activated following a green Volkswagen on Alice Bell Road. The two cars turned onto Washington Pike in front of Mr. Turner and abruptly stopped. He saw the police officer and the driver of the car get out of their cars and then heard two gunshots. After the Defendant fled the scene, Mr. Turner got out of his car and tried to help the officer until help arrived. He stated that the officer "wasn't in good shape . . . he was shot in the thigh [and] looked in pain." On cross-examination, he stated that the Defendant looked scared as he got out of his car and recalled that he held the gun at about hip level. On redirect, he further testified that he believed the Defendant intended to shoot the officer because "if you get out of a car with a gun, point it at someone, that's – that just seems like to me, that's what he was intend[ing] to do."

Officer Brian Leatherwood of the Knoxville Police Department testified that he was on patrol on the day of the offense and responded to Officer Olson's initial call for assistance with the traffic stop of the Defendant. While en route, Officer Leatherwood heard Officer Olson call out over dispatch that shots had been fired and an officer was down. At the scene, Officer Leatherwood talked to several witnesses and began a search for the Defendant. Dispatch informed Officer Leatherwood that a resident in a nearby neighborhood reported seeing the Defendant hiding in his backyard. Officer Leatherwood and two other officers approached the location on foot and saw a man, later determined to be the Defendant, running from the area. Officer Leatherwood testified that they ordered him to stop, but he ignored their commands and a foot chase ensued. The officers eventually caught up to the Defendant in a driveway in the neighborhood and took the Defendant into custody.

The Defendant told the officers that he was the passenger in the car and that another man had done the shooting and then carjacked a silver car to flee the scene. The officers later confirmed that the Defendant's story was not true. Officer Leatherwood testified that at the time of the Defendant's arrest, he did not appear to be intoxicated. He stated that the Defendant was able to communicate with the officers and his speech was not slurred. He acknowledged that the Defendant was talking fast when they apprehended him and that he threw up in Officer Leatherwood's patrol car after he was arrested.

Officer Jonathon Harris of the Knoxville Police Department testified that he also responded to Officer Olson's call for assistance on the day of the offense. Upon arrival, he

saw Officer Olson lying on the sidewalk with a "really big gunshot wound in his leg[, which] was bleeding a good bit." He assisted Officer Leatherwood in the search for the Defendant in a nearby neighborhood and testified that when they apprehended the Defendant, he immediately "started saying that it wasn't me, the other dude did it." The Defendant told the officers that another man had committed the shooting and carjacked another car. Once inside of the patrol car, the Defendant mentioned the story again and provided a few additional details. Officer Harris reported the Defendant's story to his supervisors to try to verify it and soon determined that the Defendant's story was not true.

The officers recovered a shotgun and a cell phone in a large shrub near where the shooting took place. Inside of the Volkswagen, police officers found marijuana and cocaine. The Defendant's cell phone records confirmed that the Defendant used his cell phone to access the internet twice and call his mother and girlfriend multiple times in between the shooting and his arrest. After his arrest, the Defendant placed a phone call from the Knox County Jail to his girlfriend. During the call, the Defendant's girlfriend asked the Defendant, "What made you do it?" The Defendant responded, "That motherfucker was trying to get me." His girlfriend pressed the Defendant further and asked, "If the police didn't shoot at you, what made you do it?" He answered, "I don't know, but fuck them."

Paul Lauderback, Jr., a life-long father figure to the Defendant, testified that the Defendant was not a fearful or aggressive-type person. However, a few weeks before the offense, the Defendant was shot and hospitalized for several days for his injuries. After the shooting, the Defendant's behavior changed and he became "scared . . . to go out or anything." Mr. Lauderback did not know whether the Defendant was using drugs at the time of the offense and did not know that the Defendant had a shotgun.

On cross-examination, Mr. Lauderback conceded that the Defendant did not live with him for a period of time during his teenage years when juvenile court placed him in a group home for the illegal possession of a handgun. Mr. Lauderback also conceded that the Defendant had been shot several months rather than several weeks before he shot Officer Olson as he had testified during direct examination. He acknowledged that the Defendant had led police on car chases in the past and was aware that there was an outstanding warrant for the Defendant's arrest at the time of the offense. He stated that he tried to convince the Defendant to turn himself in on the warrant but was unsuccessful. Mr. Lauderback testified that the Defendant had never been to jail as an adult; however, he later testified that he was confused about the dates and admitted that the Defendant had been to jail as an adult.

The Defendant testified and admitted that he fled from and shot Officer Olson on February 26, 2011, the day of the offense. At the time of the shooting, he was 18 years old, had previously been in a group home, and had participated in counseling when he was

-4-

younger. Prior to the offense, he was shot by a masked man on the street and started "taking a lot of drugs . . . using ecstacy [and] smoking marijuana" so that he would not feel stressed out or worried. He obtained the shotgun used in the offense for protection after he was shot.

The Defendant admitted that he borrowed the green Volkswagen from a friend on the day of the offense, but denied knowing that it was stolen. He explained that he was using the car to drive to the store and to his mother's house, and that he brought the shotgun with him to defend himself in case he encountered the masked man that shot him. He asserted that he did not know that there was a warrant out for his arrest. He testified that he "was smoking marijuana and using ecstacy and a couple other drugs" that day, and estimated that he took "like four and a half, almost five [ecstacy] pills" that morning. When asked whether he felt the influence of drugs while driving that day, he stated, "I was kind of, like, tired, you know, but I wasn't – I wasn't tired, my body was tired, but I wasn't tired." The Defendant recalled that he wrecked the car while being pursued by Officer Olson but did not know why he fled from the officer. He testified that he finally stopped because the car got a flat tire and "was barely moving." He admitted that he shot the shotgun twice, but claimed that he was not aiming at Officer Olson and did not intend to harm him. He testified, "I was just shooting – just free shooting. . . . I was not trying to shoot that man. I was not trying to kill him in no way. I was not trying to harm him. . . . I wasn't trying to aim it at him, it just – it's like he just jumped out there into the shot[.]"

The Defendant testified that Officer Olson was still in his patrol car when he fired the first shot, and that he fired "out towards the side of the car, like, down the street." He asserted that Officer Olson opened his door and jumped out of the patrol car at the same time that the Defendant fired the second shot, which is when the officer was hit. After shooting the officer, the Defendant claimed that he turned to run and pulled the trigger a third time but the gun was empty. He maintained that he was not trying to shoot the officer again. He acknowledged that he told officers that another suspect was involved when he was taken into custody, but stated that he "wasn't thinking" and "didn't really understand what was going on." He asserted that the video after his arrest shows him talking faster than normal, which he claimed to be a result of the drugs in his system. He maintained that he did not realize why he was in jail until several days later because he was in withdrawal from the drugs he had been using.

On cross-examination, the Defendant acknowledged that he was not supposed to be driving because his license was suspended and that he was aware that it was illegal for him to have the shotgun. When asked whether Officer Olson's shooting was his fault, the Defendant stated, "Not exactly. . . . It's really nobody's fault." He agreed that he applied the brakes and stopped the car, put the car in park, and grabbed the shotgun off of the passenger floorboard knowing that it was loaded and ready to fire. He maintained that he did not intend

to scare Officer Olson or harm him in any way. He agreed that he knew he would likely go to jail if apprehended by Officer Olson and wanted to get away from the officer. He also acknowledged that he pulled the trigger a third time after Officer Olson had been shot, and agreed that it was still pointing in the same direction as Officer Olson but insisted that he was not trying to shoot him again.

Following deliberation, the jury convicted the Defendant of attempted first degree murder and employing a firearm during an attempt to commit a dangerous felony, for which he received an effective sentence of thirty years confinement. On June 18, 2012, the Defendant filed a motion for a new trial, in which he argued that the trial court erred in failing to instruct the jury on voluntary intoxication as it relates to premeditation and failing to instruct the jury on aggravated assault. The trial court denied the motion in a written order on October 29, 2012. It is from this order that the Defendant now appeals.[2]

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain his convictions for attempted first degree murder and employing a firearm during an attempt to commit a dangerous felony.[3] He also argues that the trial court erred in failing to allow the jury to consider voluntary intoxication to negate premeditation for attempted first degree murder. The State responds that the evidence presented establishes the Defendant's guilt beyond a reasonable doubt and that the trial court properly refused to charge the jury on voluntary intoxication. Upon review, we agree with the State.

**I. Sufficiency of the Evidence.** In contesting the sufficiency of the evidence, the Defendant concedes that he fired two shots from a shotgun in the direction of Officer Olson's patrol car after leading Officer Olson on a high speed car chase. Notwithstanding these facts, he argues that the evidence fails to establish premeditation, a required element of the offense. He notes that he did not make any statements in which he expressed an intent to kill Officer

---

[2] The Defendant filed an untimely notice of appeal on December 6, 2012; however, this Court waived the timely filing requirement in the interest of justice, noting that counsel "filed the notice of appeal only eight days late and within seven days of his appointment by the trial court."

[3] We note that the Defendant did not raise sufficiency of the evidence in his motion for new trial. However, it is well settled that sufficiency of the evidence issues need not be presented in a motion for new trial as a predicate for raising these issues on appeal. See Tenn. R. App. 3(e) (failure to raise an issue of error, other than sufficiency of the evidence or sentencing, in a motion for new trial waives that issue for purposes of appellate review); State v. Patterson, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997). Thus, the Defendant's failure to raise sufficiency of the evidence in his motion for new trial does not preclude our review of the issue on appeal.

Olson, and that he testified that he was "shooting just to shoot" and did not intend to kill Officer Olson. Therefore, he asserts that the evidence is insufficient to convict him of attempted first degree murder and, as a result, insufficient to convict him of employing a firearm during the commission of an attempted first degree murder. The State responds that the evidence presented was sufficient to sustain both convictions. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this Court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This Court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Tennessee Code Annotated section 39-12-101(a)(3) states that a person commits criminal attempt who "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." The statute further states that "[c]onduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." T.C.A. § 39-12-101(b).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2006). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

Here, the Defendant argues that his testimony at trial established that he did not intend to shoot Officer Olson, and therefore, the evidence is insufficient to establish premeditation. We disagree. As noted above, premeditation is a question of fact reserved for the jury and no particular set of facts is necessary to establish its existence. The jury may infer premeditation from any number of facts and circumstances surrounding the offense. The evidence in this case demonstrates that the Defendant led Officer Olson on a high speed car chase, which ended when the Defendant abruptly stopped his car. The Defendant quickly exited his car with the hoodie of his sweatshirt pulled up on his head and with a shotgun in his hands. He ran towards Officer Olson's patrol car, fired two shots in the direction of the car, and then fled the area on foot. One of these shots struck the driver side door of the car and the other struck Officer Olson in the right thigh. Although the gun did not discharge a third time, the Defendant admitted that he pulled the trigger a third time while the gun was

still pointed in the direction of Officer Olson's car. After the shooting, the Defendant discarded the gun in a nearby shrub and used his phone to access the internet and call his mother and girlfriend. During a jailhouse phone call, the Defendant told his girlfriend that he shot Officer Olson because the officer was "trying to get" him. Viewed in the light most favorable to the State, there was more than sufficient evidence for a rational juror to conclude that the Defendant acted with intent and premeditation when he shot Officer Olson. The Defendant is not entitled to relief.

The Defendant also argues that the evidence is insufficient to sustain his conviction for employing a firearm during an attempted first degree murder. The Defendant premises his argument entirely on the claim that because the evidence is insufficient to support his conviction for attempted first degree murder, it is likewise insufficient to support his conviction for employing a firearm during an attempted first degree murder. The Defendant makes little to no further argument in support of this issue and fails to cite any authority or reference the record to aid in our review. See Tenn. Ct. Crim. App. R10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this [C]ourt."). Regardless of the Defendant's scant argument or citation in support of this issue, we have reviewed the record and conclude that the evidence sufficiently supports his conviction for employing a firearm during an attempt to commit a dangerous offense.

**II. Jury Instructions.** The Defendant next asserts that the trial court erred in failing to allow the jury to consider voluntary intoxication to negate culpability for attempted first degree murder. The Defendant maintains that he presented evidence of his intoxication during the offense, and therefore, was entitled to a jury instruction. The State responds that the Defendant failed to request the instruction at trial, and therefore, has waived the issue for review. The State further asserts that notwithstanding waiver, the trial court properly instructed the jury. We agree with the State.

Relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a); see also, State v. Cravens, 764 S.W.2d 754, 756-57 (Tenn. 1989) ("Questions concerning the [jury] instructions are generally deemed to be waived in the absence of objection or special request, unless they contain plain error."). The Defendant states in his brief that the trial court improperly refused his request for a jury instruction on voluntary intoxication; however, as noted by the State, the Defendant does not provide any citation to the record for this request and we have been unable to locate the request after a thorough review of the record. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where

. . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). We conclude that the Defendant has waived this issue for consideration on appeal to this Court. However, waiver notwithstanding, we conclude that the trial court properly instructed the jury.

Voluntary intoxication "is admissible in evidence if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a). "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." State v. Hatcher, 310 S.W.3d 788, 814 (Tenn. 2010). "However, [p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions as requested . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent." Id. (footnote omitted) (quoting Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979) perm. app. denied (Tenn. Jan. 28, 1980)); see also, Ben Mills v. State, No. W2005-00480-CCA-R3-PC, 2006 WL 44381, at *8 (Tenn. Crim. App. Jan. 5, 2006) ("[W]hile intoxication is not in itself a defense to prosecution, a defendant's intoxication, whether voluntary or involuntary, is admissible in evidence if it is relevant to negate a culpable mental state."), perm. app. denied (Tenn. May 1, 2006).

In the present case, the record shows that the Defendant presented proof that he was intoxicated at the time of the offense. Drugs were found in the Defendant's car and he testified that he had been using ecstasy and smoking marijuana on the day of the offense. There was also evidence that the Defendant exhibited signs of withdrawal after being taken into custody. However, the Defendant presented no evidence that he lacked the culpable mental state required for attempted first degree murder because of voluntary intoxication.[4] See Hatcher, 310 S.W.3d at 815 ("The determinative question is not whether the accused was

---

[4] The Defendant attempted to introduce expert testimony by Dr. Pam Jones, a clinical psychologist, to further establish that the Defendant was intoxicated at the time of the offense and that his conduct was likely affected by his intoxication. The trial court excluded this testimony after Dr. Jones conceded that she could not opine whether the Defendant's intoxication affected his ability to form the requisite mental state. The Defendant did not challenge the trial court's decision in his motion for new trial or on appeal; therefore, we decline to address this issue.

intoxicated, but what was his mental capacity."). Therefore, because the Defendant failed to present any evidence about how his intoxication negated his culpable mental state we conclude that the trial court did not err in failing to give an instruction regarding voluntary intoxication. Accordingly, the Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing authorities and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE