IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 31, 2018 Session

## JAMES EDGAR YARBROUGH v. CHERYL ANN PINEGAR YARBROUGH

Appeal from the Circuit Court for Shelby County
No. 107677-RD     Jerry Stokes, Judge

———————————————

### No. W2017-00152-COA-R3-CV

———————————————

A wife filed a motion pursuant to Tennessee Rule of Civil Procedure 60.02(3) to set aside a final decree of divorce granted on the ground of irreconcilable differences. The trial court denied the motion, finding that she failed to prove by clear and convincing evidence that the judgment was void. We affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Cheryl Ann Pinegar Yarbrough, Memphis, Tennessee, Pro Se.

Jean Ellen Markowitz, Memphis, Tennessee, for the appellee, James Edgar Yarbrough.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Thirty-one years ago, on March 25, 1987, Cheryl Ann Pinegar Yarbrough ("Wife") was granted a divorce from James Edgar Yarbrough ("Husband") on the ground of irreconcilable differences. In the final decree of divorce, the trial court incorporated a Property Settlement Agreement ("PSA") that provided Wife with custody of the parties' son, required Husband to pay $300 per month in child support, and divided the parties' debts and real and personal property. The parties lived in accordance with the terms of the PSA following the divorce.

Husband began working at FedEx during the marriage and continued working there until he retired in November 2005. Wife learned of his retirement sometime in

2006 and, believing she was entitled to receive a portion of his retirement funds pursuant to the PSA, she began investigating why she had not received any such funds. She contacted FedEx and was informed that they could not speak with her about Husband's retirement funds. According to Wife, this conversation made her believe there was a problem with the PSA and she "needed to do something to protect [her] rights." She then filed a malpractice lawsuit against the attorneys who represented her in the divorce, David E. Caywood and Darrell D. Blanton, because she believed that to be her remedy. Wife took a voluntary non-suit in the case but, in April 2013, she refiled her complaint against both of her former attorneys.[1] The court dismissed the action in July 2016, holding that the cause of action was not timely filed.

On July 6, 2016, Wife filed a motion to set aside the final decree of divorce pursuant to Tennessee Rule of Civil Procedure 60.02, alleging that the final decree was void because the PSA "was filed absent her signature." In support of her motion, Wife attached a copy of a certified copy of the PSA that was certified on August 5, 2008. The copy relied on by Wife consists of six pages, with page six containing the conclusion of the parties' agreement immediately followed by two signature lines, one for each party. A notary block with a line for Husband's signature is located at the bottom of the page. Husband's signature appears on the line provided for him immediately following the conclusion of the agreement and on the line provided for him in the notary block. Wife's signature, however, does not appear on page six or on any of the preceding pages. In her motion, Wife sought alternate relief, namely that the trial court enter a qualified domestic relations order awarding her an equitable share of Husband's retirement account because no provision was made for it in the PSA or elsewhere in the final divorce decree.

Husband filed a motion to dismiss, or in the alternative, for summary judgment as well as a statement of undisputed facts on July 27, 2016, arguing that Wife did, in fact, sign the PSA. In support of his motion, he relied on a certified copy of the divorce file that was certified on December 14, 1987.[2] The PSA included in this certified copy consists of seven pages. The first six pages are identical to the copy relied on by Wife in her motion. Located at the top of page seven is the conclusion of the notary block for Husband's signature that began on page six. It states that he signed the document on March 24, 1987, with the signature of the notary public who witnessed his signature following immediately thereafter. In the middle of page seven, a second notary block appears—one for Wife's signature. This notary block contains what appears to be the signature of Wife and the date March 25, 1987. The line provided for the notary public also has a signature; however, below the signature line, the words "NOTARY PUBLIC" have been crossed out and the letters "D.C." written to the side.

---

[1] Mr. Caywood died before the malpractice action concluded.

[2] The parties rely on certified copies of the divorce file because the original divorce file is missing. At oral argument, counsel for Husband told the court, "Records show that [Wife] and a friend were the last to see it."

On September 14, 2016, Wife filed a response to Husband's motion and statement of undisputed facts, arguing that she did not author the signature above her typed name on page seven. She attached a report written by her retained forensic document expert, Dianne Peterson, which stated that it was "highly probable" that Wife did not author the questioned signature on page seven. The trial court heard Husband's motion on September 16, 2016, and entered an order on September 28, 2016, denying the motion because a material question of fact existed regarding whether Wife authored the signature on page seven.

The trial court held a hearing on Wife's Rule 60.02 motion on December 2, 2016, during which Wife, Husband, and several other witnesses testified. Wife testified that, on March 25, 1987, she met her attorney, Mr. Blanton, at the courthouse approximately five minutes before the divorce proceeding began. At that time, Mr. Blanton presented the PSA to her for her signature. According to Wife, this was the first time she had seen the PSA, and she refused to sign the document because "there were many, many mistakes in it." She stated that she did not sign the PSA at any time thereafter. When she was shown a copy of page seven at the hearing, Wife testified that the signature was not hers. She remembered going down to the clerk's office with Mr. Blanton before entering the court room for the divorce proceeding and, while in the clerk's office, she saw Husband sign the PSA. Wife stated that she testified at the divorce proceeding but the totality of her testimony was "yes, I do want a divorce." Finally, she testified that the following occurred as required by the terms of the PSA: (1) she obtained a divorce on the ground of irreconcilable differences, (2) she gained custody of the parties' child and received child support, (3) she received the real property and notes allocated to her, and (4) she relinquished the property allocated to Husband.

Husband testified about the circumstances surrounding the signing of the PSA and the divorce proceeding. When he met his attorney, Jerry Martin, at the courthouse on March 25, 1987, they were the first to arrive. Contrary to Wife's testimony, Husband stated that the PSA already bore his signature because he had signed it the previous day at Mr. Martin's office where a notary public witnessed and notarized his signature. Wife and Mr. Blanton met Husband and Mr. Martin in a hallway outside the courtroom prior to the hearing. Mr. Martin handed the PSA to Mr. Blanton who then handed it to Wife to sign. Husband testified that, after Wife refused to sign the PSA, Mr. Blanton spoke with her, and the two of them then walked down the hallway out of Husband's sight. Shortly thereafter, Wife and Mr. Blanton returned and Mr. Blanton handed the PSA to Mr. Martin stating that "it's signed . . . it's taken care of." Mr. Martin scanned through the document and nodded his head in agreement. Mr. Martin, Mr. Blanton, and Wife then went into the courtroom while Husband waited in the hallway. According to Husband, they exited the courtroom between fifteen and twenty minutes later. Mr. Martin shook Husband's hand and informed him that he would be in contact with him. Several months after the hearing, Husband received a certified copy of the divorce file that was certified on December 14, 1987. When asked who sent him the certified copy of the file, he

responded that he believed it came from Mr. Martin. Finally, Husband testified that he, at no time, forged the signature of any person on any document in the divorce.

Sharon Carter testified as a witness for Husband. Ms. Carter had worked in the clerk's office for approximately twenty-five years and, at the time of trial, was the manager of the filing counter at the circuit court for Shelby County. She testified about the procedures followed when a person wants a document attested to or sworn to before the clerk. If a person wants a document notarized, he or she must show identification. If a person wants a document sworn to, the clerk's office typically does not require identification because most people come with an attorney who tells the clerk "this is my client." However, when a person wants a document sworn to but does not come with an attorney, he or she is required to show identification. Ms. Carter was shown a copy of page seven of the PSA and asked if she recognized the signature above the handwritten "D.C." She responded that she recognized the signature as that of Robert Matthews, who worked as a manager and later as an administrator in her office. At the time of the parties' divorce, Mr. Matthews served as the deputy clerk. Ms. Carter admitted on cross-examination that the parties' divorce file was missing from the clerk's office.

Mr. Blanton also testified on behalf of Husband. He remembered representing Wife in the divorce but had no specific memory of what occurred on March 25, 1987. Although Mr. Blanton could not remember how events transpired, he testified that his practice in 1987 was that, if his client had not signed the PSA on the day of the hearing, he would take his client to the clerk's office and have the clerk witness his client's signature. He would then take his client into the courtroom and ask the following series of questions:

> Can you give me your name, please; at the time you filed the complaint for divorce have you been a resident of Shelby County for at least six months; at the time you filed the complaint did irreconcilable differences exist between you and your husband; is the statistical data contained in the original complaint for divorce true and correct; at the time you and your husband - - if it's a wife - - entered into a marital dissolution agreement do you believe the agreement makes a fair and equitable division of your marital property rights and are you asking the court to approve it.

Mr. Blanton stated that he had never taken a client into court for an irreconcilable differences divorce if the PSA had not been signed.

On cross-examination, Mr. Blanton acknowledged that Wife did not sign page six of the PSA but explained that her notarized signature on page seven made the agreement valid. He stated that, despite having no memory of her signing the PSA, he knows she signed it because "Robert Matthews said she signed it; we have the document that showed she signed it; [the judge] approved it; she sat on the witness stand and asked [the

judge] to approve it." He further stated that he knows he saw her sign it because he would not have taken her into court if she had not done so.

Both parties presented expert testimony from a forensic document examiner. Dianne Peterson testified on behalf of Wife. Ms. Peterson explained that the responsibilities of a forensic document examiner include determining whether documents are genuine, identifying handwriting and the source of a document, and preserving or restoring legibility. She began working as a forensic document examiner in 2009. When asked why she became a forensic document examiner, she responded that she loved "dealing with details and identity and stuff and just all the finer details in handwriting." Ms. Peterson received her training from the International School of Forensic Document Examination ("ISFDE"). This training consisted of a two-year curriculum that was solely online with no personal, hands-on supervision. As a result, she did not work with any original documents. Instead, her training consisted of analyzing electronic and copied documents. Even her peer review was conducted online. After completing the program at ISFDE, Ms. Peterson continued her training by completing a two-year course with Kathy Koppenhaver[3] that focused on examining questioned signatures. She also completed this training online. Ms. Peterson is affiliated with the Scientific Association of Forensic Examiners ("SAFE") and is the treasurer of that organization. She had testified as an expert forensic document examiner eleven times prior to testifying in this case and has been admitted as an expert witness in Tennessee, Alabama, and Georgia.

During voir dire, Ms. Peterson admitted that she worked only part-time as a forensic document examiner because she worked full-time as a dental hygienist. She further admitted that the only certification she held was the certificate of completion she received from ISFDE.

Ms. Peterson examined the questioned signature on page seven of the PSA and compared it to copies of twelve signatures known to have been authored by Wife. Based on the twelve known signatures, she opined that it "was highly probable" Wife did not author the questioned signature. Ms. Peterson explained that she could not conclude with one hundred percent certainty that Wife did not author the questioned signature because, to make such a conclusion, she needed an original document to examine, which she did not have.

After comparing the questioned signature to the known signatures, Ms. Peterson identified several differences that she considered significant. First, she testified, "Pinegar" is misspelled in the questioned signature because the "I" is missing. Second, she stated, in the known signatures, the final stroke connecting the "G" and "H" in "Yarbrough" resembled a capital "R" that tilts to the left. In the questioned signature,

---

[3] According to Ms. Peterson, Ms. Koppenhaver is a certified forensic document examiner with over thirty years of experience.

however, the final connecting stroke "looks like a circular pattern." Third, Ms. Peterson testified, the questioned and known signatures utilized space differently. Specifically, there is little to no spacing between the letters in the questioned signature, whereas the letters are more spaced out in the known signatures. Ms. Peterson then testified that "Ann" is different in the questioned signature than in the known signatures. In the questioned signature, the "A" is "a printed style fashion" but, in the known signatures, it "had a rounded formation." Furthermore, the "N's" are rounded in the questioned signature but look like "needlepoint[s]" in the known signatures. According to Ms. Peterson, two of the letters in the questioned signature indicate that it was not authored by Wife: the "N" in "Pinegar" in the questioned signature has a pen stroke that is "a lot darker," which was "almost indicative of a possible drawing of a pen lift" rather than a fluid stroke typical of a natural signature, and the "R" in "Cheryl" had "an extra pen stroke where it lifts or comes off the page and then goes back down for the drawing effect."

In addition to the identified signature differences, Ms. Peterson based her opinion on an examination of the entire PSA. She stated that page seven was not aligned either vertically or horizontally with the preceding pages. For instance, the paragraph indentations "are not lined up" with those on page six, and the page number at the bottom of the page is off-center, unlike on the preceding pages. Ms. Peterson opined that this misalignment meant that it was "highly probable" that page seven had been altered. She testified that it concerned her that page seven had two different dates on it (March 24 and 25, 1987) and that the second notary block did not have a notary commission.

During cross-examination, Ms. Peterson acknowledged that she did not know how many times the document she examined had been copied or what generation copy it was. She identified a report prepared by Husband's expert forensic document examiner, Grant Sperry, and stated that she reviewed it to prepare her rebuttal report. She admitted that the "Ann" in two of the known signatures in Mr. Sperry's report "were very similar to the questioned signature." Finally, when asked if the original document was created by a word processor or typewriter, she responded that she had no idea how it was created.

Grant Sperry testified as an expert forensic document examiner on behalf of Husband. Mr. Sperry had worked as a full-time forensic document examiner for thirty-seven years. His primary responsibilities consist of examining and comparing questioned and known documents for the purpose of identifying a particular person, machine, or item as the source of the questioned document. Seventy-five percent of his work involves examining handwriting to determine whether a particular person authored a questioned document. Additionally, his evaluations of questioned documents include determining what type of machine (typewriter, copier, etc.) produced the document.

Mr. Sperry began training as a forensic document examiner in 1979. He completed a two-year in-residence course offered by the United States Department of the

Army, which is "the executive agency for forensics within the department of defense." During this two-year course, he dealt strictly with forensic document examination and examiners "with many years of experience" supervised and trained him. After Mr. Sperry completed this training, the Department of the Army certified him in the criminal investigation division as a questioned document examiner—now known as a forensic document examiner. He testified that he then received additional training through:

> [T]he Georgia Bureau of Investigation Laboratory in Atlanta[;] U.S. Secret Service Laboratory in Washington, D.C.; the Federal Bureau of Investigation Laboratory in Quantico, Virginia; Royal Canadian Mounted Police Laboratory in Montreal; . . . International Symposium of Questioned Document Examiners; Immigration Naturalization Service Laboratory in Washington, D.C.; Central Intelligence Agency in Washington, D.C.; Bureau of Printing and Engraving in Washington, D.C.; . . . First European Conference of Handwriting Experts in Wiesbaden, Germany; . . . [and] Rochester Institute of Technology[.]

Mr. Sperry is affiliated with several professional forensics organizations, including the American Society of Questioned Document Examiners, of which he once served as president. He has testified as an expert forensic document examiner approximately 345 times and has been admitted as an expert witness in all courts of the military, various federal and state courts, and international courts in Europe and Asia.

Mr. Sperry testified that he conducted a thorough investigation of the questioned document in this case, which involved a three-step process. First, he examined the questioned signature to determine whether it was a naturally executed signature or the product of "a simulation copying process or tracing." He explained that, if a signature is the product of a tracing, that fact is discernable because tracing an outline results in stops and starts that affect the smoothness and rhythm of the writing. He further explained that, when a person attempts to simulate a signature, he or she draws the signature from memory, trying to "capture the pictorial representation of the signature" and "the enumerable writing habits that that person [the one whose signature is being simulated] has taken years and years and years to develop," which is "an improbable proposition" with a signature as long as the questioned signature in this case. After examining the questioned signature, Mr. Sperry found that "the smoothness of the lines, upstrokes, downstrokes, pen pressure variation, [and] tapering of strokes" were the opposite of what would be expected in a simulation or tracing. He opined that the signature was a naturally executed writing from start to finish.

Mr. Sperry then moved on to the second step in his examination—cross comparing the various known writings of Wife to determine her writing habits over a period of time. In performing this cross-comparison, Mr. Sperry reviewed thirty-four original and previously-copied documents bearing Wife's known signature, including the twelve

reviewed by Ms. Peterson. He testified that the purpose of this step is to determine whether the known writings are all writings of the same person and to determine the range of variation. He explained that the phrase "range of variation" refers to variation that occurs naturally in writing. Because people are not machines, they are incapable of precisely replicating their signatures; however, they do have habits such as letter formation, spacing, line quality, relative spacing, pressure, and inclination of relative slant. Within each of these areas, there is a range of variation.

After establishing Wife's range of variation, Mr. Sperry moved on to the final step in his examination: comparing the questioned signature to the known signatures. During this comparison, he found several "features and characteristics to be well replicated." For instance, in the questioned signature, the baseline placement, relative slants, and height relationship of the "C" and "H" in "Cheryl" replicate three of the known signatures. He testified that the lack of space between letters in the questioned signature is a well-represented habit of hers, especially between the "Y" and "L" of "Cheryl"; he pointed to four of the known signatures demonstrating that habit. Additionally, he stated that the printed-style "A" and rounded "N's" in "Ann" are in agreement between the questioned signature and two of the known signatures. In Mr. Sperry's opinion, no fundamental differences exist between the questioned and known signatures, and every variation present in the questioned signature was reflected within the known signatures "to some extent." He stated that he was as sure that Wife signed the questioned signature as if he "were there and watched her write it."

Finally, Mr. Sperry testified about aspects of Ms. Peterson's testimony. He disagreed with her testimony that the "R" in "Cheryl" had an extra pen stroke indicating a possible simulation. According to Mr. Sperry, the mark she identified as an extra pen stroke was an "artifact from the copying process" and a reflection of the quality of the copier and toner that produced the document. He also disagreed with her testimony that "Pinegar" was misspelled in the questioned signature, stating that the "I" was, in fact, there. He explained that the introductory stroke to the "I" began to the left of the staff of the "P," continued up "inside the bulb of the 'P,'" and returned down to form the "N." With respect to her testimony that page seven was not aligned with the preceding six pages of the PSA, Mr. Sperry stated that the document was a word processing product and it is not unusual to have some misalignment "just based on the feed of the document." He noted that the size and style of the font used on page seven is identical to that used on the preceding pages of the document.

On December 7, 2016, the trial court entered an order denying Wife's Rule 60.02 motion, finding that she failed to prove by clear and convincing evidence that the questioned signature was "not her authentic signature." The court also denied her request for alternate relief, finding that the PSA contained a provision waiving "any and all further division of property among the parties not specifically addressed" in the document. Wife appeals.

## II. STANDARD OF REVIEW

Judgments or orders adjudicating all of the claims and rights of the parties to a lawsuit become final thirty days after they are entered. *Hussey v. Woods*, 538 S.W.3d 476, 482 (Tenn. 2017). For thirty days following entry of a final judgment, Tennessee Rule of Civil Procedure 59.02 allows a party to seek relief from the judgment. *Discover Bank v. Morgan*, 363 S.W.3d 479, 488-89 (Tenn. 2012). If a party waits more than thirty days after entry of a final judgment to seek relief, he or she must do so under Tennessee Rule of Civil Procedure 60.02. *Id.* at 489.

Generally, we review a trial court's decision to grant or deny a request for relief pursuant to Rule 60.02 under the abuse of discretion standard. *Turner v. Turner*, 473 S.W.3d 257, 268 (Tenn. 2015). This standard does not apply, however, in cases where relief is sought under Rule 60.02(3), which grants a party relief from a void judgment. *See Hussey*, 538 S.W.3d at 483. When reviewing a trial court's decision to grant or deny relief pursuant to Rule 60.02(3), our review is de novo, according no presumption of correctness to the trial court's determination. *Id.* We review the trial court's factual findings de novo, with a presumption of correctness, unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *Turner*, 473 S.W.3d at 269.

Relief under Rule 60.02 is an exceptional remedy that allows a court "'to alleviate the effect of an oppressive or onerous final judgment.'" *Black v. Black*, 166 S.W.3d 699, 703 (Tenn. 2005) (quoting *Killion v. Dep't of Human Servs.*, 845 S.W.2d 212, 213 (Tenn. 1992)). Rule 60.02 does not provide relief to a party "'merely dissatisfied with a particular outcome'" or whose circumstances change after a judgment is entered. *Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114, 127-28 (Tenn. 2013) (quoting *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 336 (Tenn. 2010)); *see also Hussey*, 538 S.W.3d at 482. Instead, Rule 60.02 provides relief in limited circumstances where a case "meet[s] one or more of the criteria stated" in the rule. *Toney v. Mueller Co.*, 810 S.W.2d 145, 146 (Tenn. 1991). Our Supreme Court has described Rule 60.02 as "an escape valve from possible inequity that might otherwise arise from the unrelenting imposition of the principle of finality imbedded in our procedural rules." *Thompson v. Firemen's Fund Ins. Co.*, 798 S.W.2d 235, 238 (Tenn. 1990). Because finality is important, "the 'escape valve' should not be easily opened." *Toney*, 810 S.W.2d at 146.

The party seeking relief under Rule 60.02 must prove by clear and convincing evidence that he or she is entitled to relief. *Furlough*, 397 S.W.3d at 128. Evidence is clear and convincing if it leaves "'no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

III. Analysis

A. Appellate Brief Requirements

We begin by noting that Wife is a pro se litigant. This Court has stated the following principles about pro se litigants:

Parties who decide to represent themselves are entitled to fair and equal treatment by the courts. The courts should take into account that many pro se litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary. Thus, the courts must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe.

*Young v. Barrow*, 130 S.W.3d 59, 62-63 (Tenn. Ct. App. 2003) (citations omitted); *see also Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct App. 2003). Additionally, we allow pro se litigants some latitude in preparing their briefs and endeavor to "give effect to the substance, rather than the form or terminology," of their court filings. *Young*, 130 S.W.3d at 63.

In addition to arguing that the trial court did not err in denying Wife's Rule 60.02 motion, Husband asserts that we should affirm the trial court's decision because Wife waived the issues she raises due to her failure to comply with Rule 27 of the Tennessee Rules of Appellate Procedure or Rule 6 of the Rules of the Court of Appeals. Tennessee Rule of Appellate Procedure 27 governs the content of appellate briefs. Subsection (a) of that rule identifies the requirements for the appellant's brief and provides, in pertinent part, as follows:

The brief of the appellant shall contain under appropriate headings and in the order here indicated:

(1) A table of contents, with references to the pages in the brief;

(2) A table of authorities, including cases (alphabetically arranged), statutes and other authorities cited, with references to the pages in the brief where they are cited;

. . . .

(4) A statement of the issues presented for review;

(5) A statement of the case, indicating briefly the nature of the case, the course of proceedings, and its disposition in the court below;

(6) A statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record;

(7) An argument, which may be preceded by a summary of argument, setting forth:

      (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and

      (B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues);

(8) A short conclusion, stating the precise relief sought.

TENN. R. APP. P. 27(a). Likewise, Rule 6 of the Rules of the Court of Appeals provides, in pertinent part:

(a) Written argument in regard to each issue on appeal shall contain:

(1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, with citation to the record where the erroneous or corrective action is recorded.

(2) A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.

(3) A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.

(4) A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.

(b) No complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.

We agree that the appellate brief Wife submitted fails to comply sufficiently with the foregoing rules. Although her brief contains several deficiencies, we need not recite each one. Most importantly, however, her brief fails to cite to relevant authority in support of her arguments. Generally, when a party fails to cite to relevant authority, we consider that issue waived. *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000). As this Court stated in *Newcomb v. Kohler Company*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006), "[a] skeletal argument that is really nothing more than an assertion will not properly preserve a claim[.]" We have no duty "to verify unsupported allegations in a party's brief or to research and construct the party's argument." *Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) (citing *Bean*, 40 S.W.3d at 56).

Despite the deficiencies in Wife's brief, we are able to discern the substance of her argument. Rule 2 of the Tennessee Rules of Appellate Procedure permits this Court to waive the briefing requirements if good cause exists.[4] *Chiozza*, 315 S.W.3d at 489. We hereby exercise our discretion under Rule 2 and consider the substance of Wife's appeal because public policy prefers that courts resolve cases on their merits rather than dismiss them due to procedural deficiencies. *See Norton v. Everhart*, 895 S.W.2d 317, 322 (Tenn. 1995).

### B. Admissibility of Sharon Carter's Testimony

Wife challenges the admissibility of the evidence establishing that Robert Matthews authored the signature on page seven of the PSA identified by the letters "D.C." Specifically, Wife argues that Ms. Carter should not have been allowed to testify that the signature belonged to Robert Matthews "based on nothing more than she had seen his signature over the years she had worked with him."

A thorough examination of the record reveals that Wife did not make a timely objection to this evidence in the trial court; instead, she objects for the first time on

---

[4] Rule 2 of the Tennessee Rules of Appellate Procedure provides, in pertinent part:

For good cause, including the interest of expediting decision upon any matter, the Supreme Court, Court of Appeals, or Court of Criminal Appeals may suspend the requirements or provisions of any of these rules in a particular case on motion of a party or on its motion and may order proceedings in accordance with its discretion . . . .

appeal. For an evidentiary objection to be considered timely, it must be made in a motion in limine or "at the time the objectionable evidence is about to be introduced." *Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000). If a party "invites or waives error" or "fails to take reasonable steps to cure an error," he or she "is not entitled to relief on appeal." *Id.* (citing TENN. R. APP. P. 36(a), cmt. a). Moreover, in *State ex rel. City of Lafayette v. Mowell*, No. 01-A-01-9810-CV00520, 1999 WL 536304, at *1 (Tenn. Ct. App. July 27, 1999), we stated as follows:

> Absent extraordinary circumstances, a trial judge cannot be reversed for the admission of inadmissible evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection." [TENN. R. EVID.] 103(a)(1); *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. App. 1993).

> A companion rule to Rule 103(a)(1), Tenn. R. Evid., is Rule 36(a), Tenn. R. App. Proc., which provides that relief is not generally available in the appellate courts to a party who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error. This rule follows a long line of cases holding that the failure to object to the admission of evidence in the trial court is fatal to the chance to assign the admission of that evidence as error in the appellate court. *Anderson v. State,* 207 Tenn. 486, 341 S.W.2d 385 (Tenn. 1960); *Wilkerson v. State,* 208 Tenn. 666, 348 S.W.2d 314 (Tenn. 1961); *Vowell v. State,* 207 Tenn. 598, 341 S.W.2d 735 (Tenn. 1960).

Because Wife failed to object to Ms. Carter's testimony identifying the signature of Mr. Matthews at the time of trial, we decline to address whether this evidence was admissible.

### C. Admissibility of Darrell Blanton's Testimony

Wife also challenges the admissibility of Mr. Blanton's testimony that he knew she signed the PSA "[b]ecause Robert Matthews said she signed it." She argues that this testimony "appears to contain hearsay since Mr. Blanton refers to Mr. Matthews allegedly being the person who witnessed [Wife's] alleged signature instead of himself." Wife did not object to this evidence at the Rule 60.02 hearing. For the reasons set forth in the previous section, we decline to address whether this evidence was admissible.

### D. Notary Block Signature

Wife argues that the trial court erred in considering the questioned signature on page seven of the PSA because Tenn. Code Ann. § 36-4-103(b) (1987)[5] does not require

---

[5] This version of the statute was in effect at the time of the parties' divorce.

- 13 -

a notary block to obtain a divorce based on irreconcilable differences. She asserts that the statute requires both parties to execute the "actual" PSA. In other words, she argues that the divorce is void because she did not sign on the line provided for her signature immediately following the conclusion of the text of the PSA on page six.

It is well-settled in Tennessee that, if a party fails to raise an issue in the trial court, that issue is waived on appeal. *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Mabry*, 402 S.W.3d 654, 660 (Tenn. Ct. App. 2012); *see also In re M.L.P*, 281 S.W.3d 387, 394 (Tenn. 2009). The record contains no evidence that Wife raised this issue in the trial court despite having an opportunity to do so. She could have raised the issue in her response to Husband's motion for summary judgment; instead, her response consisted of an affidavit and report from Ms. Peterson stating that it was "highly probable" that Wife did not author the questioned signature.

### E. Void Judgment

Although not specifically identified as an issue, Wife argues throughout her brief that the trial court erred in finding that she failed to show by clear and convincing evidence that the final divorce decree was void. Rule 60.02(3) permits a court to relieve a party from a void judgment. A party may seek relief from a void judgment at any time, "but relief 'may be denied if certain exceptional circumstances exist.'" *Hussey*, 538 S.W.3d at 483 (quoting *Turner*, 473 S.W.3d at 279). "A 'void' judgment is one that, from its inception, is a complete nullity and is without legal effect; it binds no one and is not entitled to any respect." 46 AM. JUR. 2D *Judgments* § 25 (footnotes omitted). If a court renders a judgment but lacks jurisdiction over the parties or the subject matter, the judgment is void. *Turner*, 473 S.W.3d at 270. A judgment rendered by a court of general jurisdiction "is presumed to be valid and will be held void only when 'its invalidity is disclosed by the face of that judgment, or in the record of the case in which that judgment was rendered.'" *Id.* (quoting *Giles v. State ex rel. Giles*, 235 S.W.2d 24, 28 (Tenn. 1950)).

Wife does not dispute that the trial court had personal jurisdiction over her but argues that it lacked subject matter jurisdiction. Specifically, she argues that the trial court lacked jurisdiction to grant the parties a divorce based on irreconcilable differences pursuant to Tenn. Code Ann. § 36-4-103(b) because the PSA was not signed by both parties. As the moving party, Wife must show by clear and convincing evidence that the final divorce decree was void either on its face or in the record of the case. *Furlough*, 397 S.W.3d at 128; *Turner*, 473 S.W.3d at 270.

Tennessee Code Annotated section 36-4-103(b) (1987) provided, in pertinent part, as follows:

No divorce shall be granted on the ground of irreconcilable differences unless the court shall affirmatively find in its decree that the parties have made adequate and sufficient provision by written agreement for the custody and maintenance of any children of that marriage and for the equitable settlement of any property rights between the parties. If the court does not affirmatively find that the agreement is sufficient or equitable, the cause shall be continued by the court to allow further disposition by the petitioner. If both parties are present at the hearing, they may, at that time, ratify any amendments the court may have to the agreement. The amended agreement shall then become a part of the decree. The agreement shall be incorporated in the decree or incorporated by reference, and such decree may be modified as other decrees for divorce.[6]

In the final divorce decree, the trial court incorporated by reference the PSA filed with the court and affirmatively found that the parties "made adequate and sufficient provisions by the [PSA] for . . . the equitable settlement of the property rights between the parties." The record includes a copy of the PSA bearing the purported signatures of Husband and Wife. Thus, the judgment does not appear void on its face. If Wife is to prevail, she must show by clear and convincing evidence that the judgment is void.

At the Rule 60.02 hearing, Husband testified that he signed the PSA on March 24, 1987, the day before the divorce hearing, and that his signature was notarized at that time. The record supports his testimony because page six bears his signature and page seven shows that a notary public witnessed and notarized his signature on March 24, 1987. Wife stated that she never signed the PSA. The record, however, contains evidence contradicting her testimony. There is no dispute that, on the day of the divorce hearing, Wife refused to sign the PSA in front of Husband. According to Husband, Wife and Mr. Blanton then went down the hall and out of his sight. Mr. Blanton did not remember any specifics about the events that occurred on March 25, 1987, but he explained that, if a client had not signed the PSA on the morning of the divorce hearing, his habit was to take the client to the clerk's office and have the clerk witness the client's signature. He testified that he had never taken a client into court to obtain an irreconcilable differences divorce without a signed PSA. Other witnesses corroborated this testimony. Wife testified that she remembered going to the clerk's office with Mr. Blanton, and Ms. Carter identified the signature on page seven above the letters "D.C." as belonging to Robert Matthews, who was the deputy clerk in 1987.

Wife testified that the totality of her testimony during the divorce proceeding was "yes, I do want a divorce." Mr. Blanton, on the other hand, testified that it was his

---

[6] The version currently in effect differs slightly from the 1987 version: the second "shall" in the first sentence does not appear in the current version.

practice in an irreconcilable differences divorce to take his client into court and ask him or her a series of questions, which he then recited for the court.

The final divorce decree itself contradicts Wife's assertion that she never signed the PSA. A court speaks through its orders and judgments. *Morgan Keegan & Co., Inc. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013). A court's orders and judgments "often speak as clearly through implication as they do through express statements." *Id.* Consequently, a reviewing court must give effect "to that which is clearly implied, as well as to that which is expressly stated." *Id.* The final divorce decree states that the court granted Wife a divorce on the ground of irreconcilable differences based on, among other things, Wife's testimony, the PSA, and the entire record, all of which the court found satisfactory. It is implicit from the final decree that the court heard Wife testify to more than wanting a divorce and had before it the PSA signed by both parties.

The issue then comes down to whether Wife authored the questioned signature on page seven of the PSA. As mentioned above, both parties presented expert testimony from a forensic document examiner concerning the known signatures of Wife as compared to the questioned signature on page seven. The trial court found Husband's expert more credible than Wife's expert, stating as follows:

> [T]he Court found Mr. Sperry to be vastly more qualified and experienced than Ms. Peterson. While both are forensic document examiners, Ms. Peterson received her forensic document examiner's education through an online curriculum with no direct, personal hands-on supervision. Further, the documents used in her educational training involved reviewing and analyzing electronic and copied documents as opposed to original documents. In addition, Ms. Peterson examines documents on a part-time basis. Finally, she has testified as an expert in forensic document examinations a total of eleven times.

> On the other hand, Mr. Sperry received a hands-on education in forensic document examinations by the same agency the United States military uses. He has been an expert presenter in continuing education seminars in many states in the United States as well as in Europe and Asia. He has testified in over three hundred cases. He has had continuing education with the United States military and Central Intelligence Agency (CIA). He has been past president of the largest document examiner's organization in the world. More importantly, Mr. Sperry examined original documents in this case. Further, his explanations and conclusions were far more convincing to this Court than those of Ms. Peterson.

When we review a trial court's decision on an issue hinging on the credibility of witnesses, we afford "considerable deference" to the trial court's decision because it is in

a better position "'to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). We "'will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Id.* (quoting *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

In the present case, a thorough examination of the record does not reveal clear and convincing evidence contradicting the trial court's assessment of the expert witnesses' credibility. We, therefore, conclude that the trial court did not err in finding that Wife failed to prove by clear and convincing evidence that the final decree was void.[7]

F. Request for Alternate Relief

In her Rule 60.02 motion, Wife sought alternate relief requesting that the trial court enter a qualified domestic relations order ("QDRO") distributing Husband's retirement account. Because a PSA is a contract, it "must be interpreted and enforced according to [its] plain terms." *Anderson v. Harrison*, No. 02A01-9805-GS-00132, 1999 WL 5057, at *2 (Tenn. Ct. App. Jan. 7, 1999). The PSA contains no specific provision regarding the distribution of retirement accounts. It does, however, contain the following provisions:

> 18. The parties hereto mutually release and forever discharge each other from all claims, demands and obligations whatsoever which either of them had, now has, or which he or she may hereafter have against the other, or in the estate of the [other] by reason of any matter, cause or thing prior to the delivery and execution of this agreement.

> 19. This document constitutes the entire agreement and understanding between the parties hereto and any oral modification hereof shall be unenforceable.

According to the plain language of these provisions, the parties waived any further division of property that was not specifically addressed in the PSA. Thus, we conclude that the trial court did not err in denying Wife's request for alternate relief.

G. Attorney Fees

Husband requests that he be awarded his attorney fees on appeal. Litigants are generally required to pay their own attorney fees unless a statute or contract provision provides otherwise. *John Kohl & Co., P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534

---

[7] Because we find the questioned signature valid and affirm the trial court's decision, Wife's argument pertaining to the trial court's exclusion of Husband's thirty-year-old conviction is pretermitted.

(Tenn. 1998). Husband argues that he is entitled to damages under Tenn. Code Ann. § 27-1-122 because the appeal was frivolous. Tennessee Code Annotated section 27-1-122 provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

A decision to award damages for a frivolous appeal under this statute rests in the sound discretion of the appellate court. *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017). "This discretion is exercised 'sparingly so as not to discourage legitimate appeals.'" *Id.* (quoting *Whalum v. Marshall*, 224 S.W.3d 169, 181 (Tenn. Ct. App. 2006)). Frivolous appeals are those that are "'utterly devoid of merit.'" *In re Britton H-S.*, No. M2016-01576-COA-R3-JV, 2018 WL 1040945, at *11 (Tenn. Ct. App. Feb. 23, 2018) (quoting *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978)). We do not believe that this appeal is so utterly devoid of merit that it warrants an award of damages under Tenn. Code Ann. § 27-1-122. Thus, we deny Husband's request for his attorney fees.

## IV. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Cheryl Ann Pinegar Yarbrough, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE